691 A.2d 1255

**Flint Gregory HUNT**

v.

**STATE of Maryland.**

**No. 30, Sept.Term 1996.**

Court of Appeals of Maryland.

March 18, 1997.

Reconsideration Denied May 12, 1997.

124

Fred Warren Bennett, Assigned Public Defender, Washington, DC, for Appellant.

Gwynn X. Kinsey, Jr., Assistant Attorney General (J. Joseph Curran, Jr., Attorney General, on brief), Baltimore, for Appellee.

Argued before MURPHY, C.J.*, ELDRIDGE, RODOWSKY, CHASANOW, KARWACKI and BELL, JJ., and MARVIN H. SMITH, Judge (retired), Specially Assigned.

KARWACKI, Judge.

The instant appeal is from the Order of the Circuit Court for Baltimore City denying the second petition for post-conviction relief filed by appellant, Flint Gregory Hunt. This is the fourth time Hunt has sought our review of his capital conviction and sentence. He was convicted by a jury in 1986 of first degree murder and handgun violations. His sentence of death was vacated by us on direct appeal; his murder conviction was affirmed.[1] *Hunt v. State*, 312 Md. 494, 540 A.2d 1125 (1988). A second jury sentenced Hunt to death following a resentencing hearing. We affirmed that judgment, and his petition to the Supreme Court of the United States for writ of certiorari to review that affirmance was denied. *Hunt v. State*, 321 Md. 387, 583 A.2d 218 (1990), *cert. denied*, 502 U.S. 835, 112 S.Ct. 117, 116 L.Ed.2d 86 (1991). He then filed his first petition for post-conviction relief, which was denied by the circuit court after an evidentiary hearing. This Court denied his application for leave to appeal that denial on June 25, 1993, by an unreported order. The Supreme Court denied discretionary review of that matter. *Hunt v. Maryland*, 510 U.S. 1171, 114 S.Ct. 1206, 127 L.Ed.2d 554 (1994).

Hunt then challenged his conviction and sentence in the United States District Court for the District of Maryland by filing a petition for writ of *habeas corpus*. His *habeas* petition was premised upon his belief that, had he been effectively represented by counsel, he would have been convicted of

---

* Murphy, C.J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the Constitution, Article IV, Section 3A, he also participated in the decision and adoption of this opinion.

1. His conviction for wearing, carrying, and transporting a handgun was merged into that for use of a handgun in the commission of a crime of violence. *See Hunt v. State*, 312 Md. 494, 509–11, 540 A.2d 1125, 1132–33 (1988).

second degree murder, thus removing the death penalty from the range of sentences to which he was exposed. In *Hunt v. Smith*, 856 F.Supp. 251 (D.Md.1994), the district court rejected Hunt's claim the he had been denied effective assistance of counsel. It also declined to rule that due process encompasses an absolute right to appeal a circuit court's denial of post-conviction relief. His appeal from that court's decision was subsequently consolidated with a motion to vacate that judgment. The Court of Appeals for the Fourth Circuit later affirmed both the district court's denial of *habeas corpus* relief and the motion to vacate. *Hunt v. Nuth*, 57 F.3d 1327 (4th Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 724, 133 L.Ed.2d 676 (1996). Much like the district court, it held that Hunt neither received ineffective assistance of counsel nor was deprived of his rights under the Eighth and Fourteenth Amendments by virtue of the lack of the ability to obtain appellate review of a denial of post-conviction relief as a matter of right.

Hunt's second petition for post-conviction relief, the subject of the instant appeal, was filed on September 29, 1995.[2] After an evidentiary hearing on the petition, the circuit court issued an Order in which it denied the substance of Hunt's claims. It also stated that, given its decision, the question of Hunt's possible waiver of the issues raised need only be accorded cursory consideration. Without deciding whether a right requiring a *Johnson v. Zerbst*, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938), "knowing and intelligent" waiver was involved, *see Curtis v. State*, 284 Md. 132, 395 A.2d 464 (1978), the hearing court simply found as fact that Hunt had not knowingly and intelligently waived the assignments of error posed in his petition. Following rendition of the circuit court's Order, a Warrant of Execution was obtained. This Court stayed the execution and granted Hunt leave to appeal from

---

2. By Chapter 111, §§ 1–3 of the Acts of 1995, the General Assembly provided that, effective October 1, 1995, each convicted criminal would be entitled to only one post-conviction review. That statute amended Maryland Code (1957, 1992 Repl.Vol., 1994 Cum.Supp.), Article 27, § 645A(a).

the circuit court's denial of his petition. Before this Court, he seeks a new trial or, in the alternative, a resentencing hearing.

Prior to a recitation of the issues presented for our consideration, we shall recount the facts underlying the murder:

"While on patrol the evening of November 18, 1985 at approximately 5:20 p.m., Officer Vincent Adolfo noticed a new Cadillac with a missing window covered with plastic. In addition to the driver, the vehicle contained three other occupants. The officer, following a routine stolen car inquiry, learned that the car had been stolen. He broadcast a description of the occupants of the car and noted that the driver was 'not breaking any laws right now.'

Two officers in separate patrol cars, responding to Officer Adolfo's request for back-up, attempted to block the path of the on-coming Cadillac. Upon nearing the roadblock, the driver, later identified as Hunt, jumped out of the car while it was still moving and ran up a nearby alley. The Cadillac then struck one of the parked patrol cars and stopped; an officer detained the three passengers who were still in the car.

Officer Adolfo pursued Hunt into the alley. Upon apprehending him, the officer positioned him against a wall and tried to handcuff Hunt. Hunt pushed away, knocking the officer off balance. Hunt then pulled a .357 Magnum [single-action revolver] from his jacket and shot Officer Adolfo in the chest at close range. Within seconds, as the officer reeled from the first shot, Hunt shot him again, this time in the back. Hunt fled the scene of the crime. Officer Adolfo was pronounced dead at the hospital at 6 p.m.

In the meantime, Hunt had called his friend, Angelo Williams, and asked him to keep the gun for him, saying that he had just shot a policeman. Hunt and his girl friend, Deborah Powell, then went to his sister's house, only to leave when a television broadcast indicated that Hunt was being sought in connection with the murder. Hunt's sister later testified at trial that Hunt had seemed fine at the time, although Ms. Powell said that Hunt had been taking drugs

earlier that afternoon and appeared 'high' when he had left her.

The next day, Hunt and Powell drove to Camden, New Jersey. En route, Hunt admitted to Powell that he had shot the policeman. Hunt then boarded a bus to Santa Monica, California, leaving Powell behind. He was apprehended at a Tulsa, Oklahoma bus station five days later."

*Hunt,* 312 Md. at 498–99, 540 A.2d at 1126–27. Further facts will be recited as we address the individual questions presented.

At this juncture in the proceedings, Hunt mounts a five-pronged attack upon the circuit court's denial of his petition for post-conviction relief. He asks:

"1. Whether the Circuit Court erred in finding Appellant was not deprived of his right to an impartial jury at his capital resentencing trial when:

(a) one juror who sat (Diana Void) failed to disclose, both at the jury orientation session and on *voir dire,* a pending criminal charge that would have statutorily disqualified her from jury service under Md. Cts. & Jud. Proc. Art., § 8–207(b)(5) and which would have been a basis for an automatic challenge for cause; and

(b) one juror who sat (Patrick Russ) intentionally failed to respond to a question on *voir dire* that he had been the victim of a crime of violence which may have provided sufficient basis for a challenge for cause and, at a minimum, created a presumption of juror bias against Russ which remained unrebutted by the State.

2. (a) Whether the Circuit Court erred in finding that the reasonable doubt instructions given at Appellant's guilt/innocence trial and at his capital resentencing trial did not lower the State's burden of proof, contrary to this Court's decision in *Wills v. State,* 329 Md. 370, 620 A.2d 295 (1993); and

(b) Assuming, *arguendo,* the reasonable doubt instructions violated *Wills,* is Appellant entitled to retroactive

application of *Wills* under either Md. Ann.Code art. 27, § 645A(d) or as a matter of federal constitutional law?

3. Whether the Circuit Court erred in its determination that the State did not violate *Giglio v. United States,* 405 U.S. 150[, 92 S.Ct. 763, 31 L.Ed.2d 104] (1972), *Brady v. Maryland,* 373 U.S. 83[, 83 S.Ct. 1194, 10 L.Ed.2d 215] (1963), and *Napue v. Illinois,* 360 U.S. 264[, 79 S.Ct. 1173, 3 L.Ed.2d 1217] (1959) by

(a) failing to disclose exculpatory evidence that prior to Appellant's trial the State promised its key witness on premeditation, Aaron McNair, that it would bring his cooperation to the attention of the judge sentencing McNair on a pending assault charge; and

(b) compounding this failure to disclose by deliberately eliciting and then failing to correct Aaron McNair's false testimony about the promise.

4. Whether the State violated *Giglio* and *Napue* by eliciting from Aaron McNair false testimony about Appellant "chasing" the officer up the alley as he fired a second shot, or alternatively, whether it violates due process and the prohibition against cruel and/or unusual punishment to carry out an execution when it has been shown that the conviction and sentence were premised on materially false testimony.

5. Whether Appellant's trial attorneys rendered ineffective assistance of counsel when:

(a) they tendered erroneous jury instructions on the effect of voluntary intoxication and failed to object to the instructions as given; and

(b) they failed to object to an improper and confusing instruction on the trial court's definition of first degree murder."

In response, the State asserts that these issues have been waived or finally litigated within the meaning of Maryland Code (1957, 1996 Repl.Vol.), Article 27, § 645A.

## I.

This Court first addressed the matter of the failure of a defendant to preserve issues for post-conviction review in *Curtis v. State, supra,* 284 Md. 132, 395 A.2d 464. Specifically, in that case, we were called upon to determine the scope of Art. 27, § 645A(c) [3]; that is, whether the Legislature intended that the definition of waiver contained in that subsection resolves the right of a defendant seeking post-conviction relief to raise an issue for the first time in all cases, without regard to procedural defaults or tactical decisions by counsel. *Id.* at 141, 395 A.2d at 469.

Following affirmance of his conviction on charges of first degree murder, *Curtis v. State,* 4 Md.App. 499, 243 A.2d 656 (1968), *cert. denied,* 252 Md. 730(1969), Curtis filed a petition under the Post Conviction Procedure Act. He was denied any relief. He then filed a second such petition, alleging a deprivation of his Sixth Amendment right to "the genuine and effective representation of counsel," 284 Md. at 134, 395 A.2d at 466, both at trial and on direct appeal. He also alleged a lack of genuine assistance of counsel by his first post-convic-

---

3. Section 645A(c) reads:

 *"When allegation of error deemed to have been waived.*—(1) For the purposes of this subtitle, an allegation of error shall be deemed to be waived when a petitioner could have made, but intelligently and knowingly failed to make, such allegation before trial, at trial, on direct appeal (whether or not the petitioner actually took such an appeal), in an application for leave to appeal a conviction based on a guilty plea, in any habeas corpus or coram nobis proceeding actually instituted by said petitioner, in a prior petition under this subtitle, or in any other proceeding actually instituted by said petitioner, unless the failure to make such allegation shall be excused because of special circumstances. The burden of proving the existence of such special circumstances shall be upon the petitioner.

 (2) When an allegation of error could have been made by a petitioner before trial, at trial, on direct appeal (whether or not said petitioner actually took such an appeal), in an application for leave to appeal a conviction based on a guilty plea, in any habeas corpus or coram nobis proceeding actually instituted by said petitioner, in a prior petition under this subtitle, or in any other proceeding actually instituted by said petitioner, but was not in fact so made, there shall be a rebuttable presumption that said petitioner intelligently and knowingly failed to make such allegation."

tion counsel, in response to the State's motion to dismiss the petition on grounds of waiver under Art. 27, § 645A(c). The circuit court granted the State's motion, holding, *inter alia,* that, because Curtis failed to raise the issue of his counsel's competency at the first post-conviction proceeding, the matter had not been preserved for review. On application to the Court of Special Appeals for leave to appeal, Curtis argued that the failure to raise the inadequacy of counsel did not constitute waiver because, under Art. 27, § 645A(c), the allegations could only be waived if he could have advanced them, but intelligently and knowingly failed to do so previously. In the alternative, he argued that any waiver was excused by the existence of special circumstances, within the meaning of the statute.

The Court of Special Appeals granted Curtis's application and affirmed the circuit court's dismissal of his petition, holding that there had indeed been a waiver of the issue for postconviction review. *Curtis v. State,* 37 Md.App. 459, 462, 381 A.2d 1166, 1167 (1977). The court reasoned that waiver could exist even if Curtis had not knowingly and intelligently failed to raise the issue of trial counsel's competency. Thus, the court continued, the matter of trial counsel's inadequacy could only be considered if representation by counsel at Curtis's first post-conviction proceeding had been constitutionally inadequate, or special circumstances existed to permit review of the matter. Finding no inadequacy on the part of post-conviction counsel or special circumstances within the meaning of the statute, the court considered the issue of trial counsel's adequacy waived because it was not raised in Curtis's first petition for post-conviction relief. *Id.*

On appeal to this Court, we held that the Court of Special Appeals had erroneously interpreted subsection (c) of Art. 27, § 645A so as to "virtually do[ ] away with the concept of 'waiver' as an intelligent and knowing failure to raise an issue." 284 Md. at 140, 395 A.2d at 469. Looking to the language of the first paragraph of the subsection, Judge Eldridge, for the Court, discussed its practical interpretation:

"The test for 'waiver' which the Legislature contemplated was clearly the 'intelligent and knowing' failure to raise, not the failure of counsel or an unknowing petitioner to raise an issue.... [T]he matter of 'special circumstances' only becomes pertinent where there is an intelligent and knowing failure of the petitioner to previously raise an issue. Where the record affirmatively shows that there was not an intelligent and knowing failure to raise, there is nothing to 'excuse,' and the presence or absence of 'special circumstances' has no relevance."

*Id.* at 139, 395 A.2d at 468. Turning to the second paragraph, the Court continued:

"The statute does not speak in terms of a conclusive presumption of waiver, absent special circumstances, as viewed by the State and the Court of Special Appeals. Rather, it is a presumption of an intelligent and knowing failure to have raised an issue, which failure can be rebutted by evidence or stipulated facts showing that petitioner did not 'intelligently and knowingly' fail to raise the issue previously." [4]

*Id.*, at 139, 395 A.2d at 469.

Noting that "the legislative purpose of the Post Conviction Procedure Act, as amended by Ch. 442 of the Acts of 1965, was to adopt the concept of 'waiver' as set forth by the Supreme Court" in *Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461, 1466 (1938), and *Fay v. Noia,* 372 U.S. 391, 439, 83 S.Ct. 822, 849, 9 L.Ed.2d 837, 869 (1963), *Curtis,* 284 Md. at 142, 395 A.2d at 470, we then outlined the Supreme Court's seminal explanation of that concept in *Johnson v. Zerbst,* in which the Sixth Amendment right to counsel was implicated: " 'A waiver is ordinarily an intelligent relinquishment or abandonment of a known right or privilege. The determination of whether there has been an intelligent waiver

---

**4.** The Court added: "[T]he concept of a rebuttable presumption that a failure to raise an issue was intelligent and knowing, and the concept of 'special circumstances' excusing an intelligent and knowing waiver, are separate and distinct matters." *Curtis v. State,* 284 Md. 132, 140, 395 A.2d 464, 469 (1978).

. . . must depend, in each case, upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused.' " *Id.* at 143, 395 A.2d at 470 (emphasis omitted) (quoting *Johnson,* 304 U.S. at 464, 58 S.Ct. at 1023, 82 L.Ed. at 1466). It was this standard that was later applied in *Fay v. Noia* to a defendant's failure to file a direct appeal from a murder conviction in which a coerced confession had been introduced against him at trial. We noted the Court's language, at 372 U.S. at 439, 83 S.Ct. at 849, 9 L.Ed.2d at 869:

> " 'If a habeas applicant, after consultation with competent counsel or otherwise, understandingly and knowingly forewent the privilege of seeking to vindicate his federal claims in the state courts, whether for strategic, tactical, or any other reasons that can fairly be described as the deliberate bypassing of state procedures, then it is open to the federal court on habeas to deny him all relief if the state courts refused to entertain his federal claims on the merits— though of course only after the federal court has satisfied itself, by holding a hearing or by some other means, of the facts bearing upon the applicant's default. At all events we wish it clearly understood that the standard here put forth depends on the considered choice of the petitioner.' "

*Curtis,* 284 Md. at 144, 395 A.2d at 471 (citation omitted). Regarded as the most restrictive application of waiver principles, *Fay,* in conjunction with the prior *Johnson v. Zerbst* decision, set the stage for the General Assembly's enactment of subsection (c) of § 645A of the Post Conviction Procedure Act. Indeed, it is for this reason that the Supreme Court's differentiation between those rights to which a knowing and intelligent waiver is required to bind a criminal defendant by prior action or inaction and those that may not be vindicated absent a defendant's proper preservation of the matter is instructive in determining precisely "what type of situations the [Maryland] Legislature intended to be encompassed by subsection (c)." *Id.* at 142, 395 A.2d at 470.

Based upon our review of the Supreme Court's holdings on waiver, we observed, in *Curtis:*

"It is clear from the ... cases that whether one is precluded from asserting a constitutional right because of what may have occurred previously, even though the failure was not 'intelligent and knowing,' depends upon the nature of the right and the surrounding circumstances. A defendant may forego a broad spectrum of rights which are deemed to fall within the category of tactical decisions by counsel or involve procedural defaults.

In the broadest sense of the word, any tactical decision by counsel, inaction by counsel, or procedural default, could be described as a 'waiver.' For example, an attorney must make numerous decisions in the course of a trial. Whenever he makes one, choosing to take or forego a particular action, the alternate choice could be said to have been waived. However, with regard to constitutional rights in a criminal proceeding, in a much narrower sense the term 'waiver' could be said to connote the intelligent and knowing relinquishment of certain basic constitutional rights under circumstances where the courts have held that only such intelligent and knowing action will bind the defendant."

*Id.* at 147–48, 395 A.2d at 473; *see State v. Magwood*, 290 Md. 615, 621–22, 432 A.2d 446, 449 (1981) (" 'Almost without exception, the requirement of a knowing and intelligent waiver has been applied only to those rights which the Constitution guarantees to a criminal defendant in order to preserve a fair trial.' ") (brackets omitted) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 237, 93 S.Ct. 2041, 2052–53, 36 L.Ed.2d 854, 868 (1973)). We then concluded:

"In our view, the Legislature was using the word 'waiver' in this narrow sense in the Maryland Post Conviction Procedure Act, Art. 27, § 645A. It intended that the waiver provision of that Act, with its express definition of waiver, be applicable only in those situations where the courts have required an 'intelligent and knowing' standard [within the meaning of *Johnson v. Zerbst* and *Fay v. Noia* ]. This, we believe, is shown by the statutory background, the decisions of this Court, and logic."

*Id.* at 148, 395 A.2d at 473. To conclude otherwise, we reasoned, would be "chaotic." *Id.* at 149, 395 A.2d at 474. That is to say, if we were to apply the knowing and intelligent standard

> "every time counsel made a tactical decision or a procedural default, . . . for a criminal defendant to be bound by his lawyer's actions, the lawyer would have to interrupt a trial repeatedly and go through countless litanies with his client. . . . It is hardly conceivable that the Legislature, in adopting § 645A (c), could have intended to use the word 'waiver' in its broadest sense, thereby requiring that the 'intelligent and knowing' standard apply every time an issue was not raised before.
>
> . . . [The Legislature] intended that subsection (c), with its 'intelligent and knowing' standard, be applicable only in those circumstances where the waiver concept of *Johnson v. Zerbst* and *Fay v. Noia* [are] applicable. Other situations are beyond the scope of subsection (c), to be governed by case law or any pertinent statutes or rules. Tactical decisions, when made by an authorized competent attorney, as well as legitimate procedural requirements, will normally bind a criminal defendant."

*Id.* at 149–50, 395 A.2d at 474 (citations omitted); *see also Magwood,* 290 Md. at 622–23, 432 A.2d at 450 ("Most decisions as to trial tactics, strategy and procedural maneuvers rest with the defendant's attorney, for, to require an intelligent and knowing waiver of every trial right of whatever kind would . . . adversely alter the role of the trial judge and counsel and disrupt the orderly workings of a criminal trial already designed to ensure justice for the accused.").

█ Thus, the General Assembly contemplated, for purposes of subsection (c) of the Post Conviction Procedure Act, that waiver there described assumed the restrictive character to which the Supreme Court had ascribed it. This has necessarily led to a dual framework under which a post-conviction petitioner in Maryland may endeavor to assert certain, specific

claims or rights not previously raised. That is to say, the nature of the right involved will determine whether the decision is governed by Art. 27, § 645A(c), or pertinent case law, statutes, or rules. On the one hand, if a defendant's claim does encompass that narrow band of rights that courts have traditionally required an individual knowingly and intelligently relinquish or abandon in order to waive the right or claim, *Walker v. State,* 343 Md. 629, 642, 684 A.2d 429, 435 (1996), the failure to do so knowingly and intelligently will not preclude raising the matter on post-conviction review. Courts, however, do not apply the same standard of waiver to "the vast array of trial decisions, strategic and tactical, which must be made before and during trial." *Estelle v. Williams,* 425 U.S. 501, 512, 96 S.Ct. 1691, 1697, 48 L.Ed.2d 126, 135 (1976); *see Fay v. Noia, supra,* 372 U.S. at 439, 83 S.Ct. at 849, 9 L.Ed.2d at 869; *Walker,* 343 Md. at 643–44, 684 A.2d at 435–36; *Curtis,* 284 Md. at 144–48, 395 A.2d at 471–73 (citing, *inter alia, Francis v. Henderson,* 425 U.S. 536, 96 S.Ct. 1708, 48 L.Ed.2d 149 (1976); *United States v. Nobles,* 422 U.S. 225, 95 S.Ct. 2160, 45 L.Ed.2d 141 (1975); *Davis v. United States,* 411 U.S. 233, 93 S.Ct. 1577, 36 L.Ed.2d 216 (1973)); *see also Williams v. State,* 292 Md. 201, 215–16, 438 A.2d 1301, 1308 ("[T]he waiver of other rights, which ordinarily do not require such knowing and voluntary action for a waiver to be effective, [is] not governed by the definition of waiver in the Post Conviction Procedure Act."). Therefore, in the case of procedural defaults or tactical decisions by litigants or their counsel, the litigants may be barred from asserting the right.[5]

---

5. We have consistently followed the principles expounded in *Curtis.* *See Walker v. State,* 343 Md. 629, 684 A.2d 429 (1996); *Oken v. State,* 343 Md. 256, 681 A.2d 30 (1996); *McElroy v. State,* 329 Md. 136, 617 A.2d 1068 (1993); *Trimble v. State,* 321 Md. 248, 582 A.2d 794 (1990); *State v. Romulus,* 315 Md. 526, 555 A.2d 494 (1989); *Martinez v. State,* 309 Md. 124, 522 A.2d 950 (1987); *State v. Calhoun,* 306 Md. 692, 511 A.2d 461 (1986), *cert. denied,* 480 U.S. 910, 107 S.Ct. 1339, 94 L.Ed.2d 528 (1987); *State v. Tichnell,* 306 Md. 428, 509 A.2d 1179, *cert. denied,* 479 U.S. 995, 107 S.Ct. 598, 93 L.Ed.2d 598 (1986); *Williams v. State,* 292 Md. 201, 438 A.2d 1301 (1981); *State v. Magwood,* 290 Md. 615, 432 A.2d 446 (1981).

■ Although these avenues of recourse are mutually exclusive, each has its own "escape mechanism" by which a waiver, if found to have occurred, may be excused. If there has been a knowing and intelligent relinquishment of the issue presented, the defendant may allege, and must prove, the existence of special circumstances excusing the failure to raise a right recognized under Art. 27, § 645A(c). Otherwise, he or she is without recourse.

■ In those instances involving "most rights and issues arising in litigation," *Walker,* 343 Md. at 643, 684 A.2d at 435, the Court may review otherwise unpreserved issues under the discretion granted by Maryland Rule 8–131. Under that rule, the appellate courts possess the discretion to excuse the waiver of a right or claim waivable by less than knowing and voluntary action. *Oken v. State,* 343 Md. 256, 273, 681 A.2d 30, 38 (1996). In *Oken,* revisiting the matter of waiver in the context of a petition for post-conviction relief, we rejected the petitioner's contention that circumstances existed to excuse a default. Based upon evidence that appellate counsel's failure to raise the adequacy of *voir dire* on appeal was deliberate, the decision not to raise the matter was "quintessentially a tactical [one]," *id.* at 271, 681 A.2d at 37, falling without the language of Art. 27, § 645A(c), and "governed by case law or any pertinent statutes or rules." *Curtis,* 284 Md. at 150, 395 A.2d at 474. Again, in *Walker, supra,* we recognized that "in a post conviction proceeding, [we] can excuse a waiver [under Rule 8–131] based upon an earlier procedural default if the circumstances warrant such action," 343 Md. at 647–48, 684 A.2d at 438, but rejected that the attorney's failure to object to erroneous jury instructions was excusable under the circumstances because the error did not deprive Walker of a fair trial, *id.* at 650, 684 A.2d at 439.

With these principles in mind, we now turn to the questions presented in Hunt's petition.

## II.

### A

### Diana Void

Hunt posits that he has not waived what he characterizes as his constitutional right to an impartial jury and, thus, is in a position to challenge the seating of juror Diana Void on the panel that resentenced him in 1988. Concomitant to this right, he continues, is the "constitutional right to adequately inquire of prospective jurors to determine if cause existed for disqualification." (citing *Davis v. State,* 333 Md. 27, 633 A.2d 867 (1993)). The cause, he asserts, for disqualifying Ms. Void is a charge of misdemeanor theft pending against her at the time of the resentencing. Under Md.Code (1973, 1995 Repl. Vol., 1996 Supp.), § 8–207(b)(5) of the Courts & Judicial Proceedings Article (CJ), a prospective juror is disqualified to serve if "he: [h]as a charge pending against him for a crime punishable by a fine of more than $500, or by imprisonment for more than six months, or both...." [6] Hunt reads this to contemplate automatic dismissal of any venireperson so charged; the fact of Ms. Void's pending charge rendered her statutorily disqualified from serving on the jury. We hold that Hunt has failed to avail himself of CJ Title 8 in a timely fashion. We explain.

Diana Void [7] was arrested on October 24, 1988, four days after she completed and returned her Qualification Questionnaire for Jury Service to the Baltimore City Jury Commissioner. On it she truthfully indicated a negative response to the question, "Are you presently charged with a crime other than

---

6. Theft penalties are provided by Md.Code (1957, 1996 Repl.Vol.), Art. 27, § 342. Under the charge at issue, Ms. Void was subject to both a fine of up to $500 and imprisonment for up to eighteen months.

7. Juror Void has previously been the subject of Hunt's appellate attacks. On direct appeal from his resentence of death, Hunt alleged that the trial court had improperly denied his motion to excuse Ms. Void for cause based upon her responses concerning her predisposition to impose the death penalty. *See Hunt v. State,* 321 Md. 387, 418–19, 583 A.2d 218, 233 (1990).

a minor traffic offense?" Six weeks later, when she was summonsed for service, during an orientation for all prospective panel members, she was again asked a number of qualifying questions, including whether she had any criminal charges pending. An affirmative response to this question would have been considered sufficient to warrant excuse from service. Ms. Void did not speak up. During *voir dire*, the twice-screened Ms. Void was again asked to indicate whether she had ever been charged with or convicted of a serious crime. She failed to respond. She went on to sit on the panel that resentenced Hunt to death. In the course of an investigation with regard to Hunt's petition for federal *habeas corpus* relief, a check of the Judicial Information Systems's ("JIS") database revealed Ms. Void's nondisclosure. When interviewed [8] about it, on September 8, 1995, Ms. Void indicated that, "at the time she knew she wasn't guilty, therefore, it didn't pop into her head to say anything." Ms. Void further indicated that she had not misunderstood the question when it was posed to her during the qualification stages of the proceedings.

The " 'right' to examine potential jurors, inherent in the constitutional right to a fair trial and impartial jury, translates into a defendant's right to have certain questions propounded to the jurors ... 'concern[ing] a specific cause for disqualification.' " *Boyd v. State,* 341 Md. 431, 436, 671 A.2d 33, 36 (1996) (quoting *Hill v. State,* 339 Md. 275, 280, 661 A.2d 1164, 1166 (1995)); *see also Bedford v. State,* 317 Md. 659, 670, 566 A.2d 111, 116 (1989) ("Maryland Declaration of Rights Article XXI guarantees a defendant the right to examine prospective jurors to determine whether any cause exists for a juror's disqualification."). These "causes" may take two forms: disqualification for bias or disqualification for failure to meet minimum statutory requirements for jury service. The

---

**8.** Ms. Void did not testify at the hearing on Hunt's second petition for postconviction relief; she could not be located. Testimony was therefore elicited from Cynthia Harry, an investigator for the Federal Public Defender's Office that was acting on Hunt's behalf in the federal *habeas corpus* proceeding, who conducted the interview of Ms. Void.

distinction between these two is a critical one in evaluating the case *sub judice.* In uncovering bias, a party seeks "to discover the state of mind of the juror in respect to the matter in hand or any collateral matter *reasonably liable* to unduly influence him." *Davis,* 333 Md. at 35–36, 633 A.2d at 871. This, however, is not akin to uncovering information concerning the prospective juror's age, literacy, or criminal background, for which minimum requirements exist as prerequisites to service. Moreover, the identification of a disqualifying trait or bias does not always warrant automatic dismissal of the offending juror. Rather, it is only under certain circumstances and at certain stages in the proceedings that automatic dismissal is sanctioned. It is with this aspect of the jury selection process that we are concerned in the instant case.

We must, however, first determine whether the right Hunt asserts as having been violated—the right to examine potential jurors, intrinsic to the right to a fair and impartial jury—is of the kind traditionally considered waivable only by knowing and intelligent action. Hunt contends that it is and that he did not knowingly and intelligently waive this issue because the factual basis for his challenge was not "reasonably available" in prior proceedings. He reasons that, because his attorneys lacked the time, information, and resources to investigate a possible claim of juror disqualification/ineligibility, he should not be estopped from asserting the matter. The State argues that Hunt proceeds under an erroneous standard in ascertaining the waivability of the right. It is not whether relevant matter is "reasonably available" to the defense, but rather it entails a " 'review of the nature of [the ... ] right and a consideration of the surrounding circumstances under which the right arises.' " (Quoting *Oken,* 343 Md. at 272, 681 A.2d at 38). Such a review, the State continues, reveals that a waiver consistent with *Johnson v. Zerbst* principles is not required to forego the ability to contest a juror's seating on the panel. Indeed, defense counsel's acceptance of the jury panel was sufficient to bar any subsequent objection thereto. *See Gilchrist v. State,* 340 Md. 606, 617–18, 667 A.2d 876, 881 (1995).

■ Because there is no authority for the proposition that the right to examine prospective jurors requires a knowing and voluntary waiver, Art. 27, § 645A(c) is not applicable, and we proceed under the second category of the analysis recited above and look to pertinent case law, statutes, and rules to determine Hunt's ability to challenge Ms. Void at this juncture in the proceedings. *See Curtis*, 284 Md. at 150, 395 A.2d at 474.

Juror selection in Maryland is regulated by CJ Title 8, Subtitle 2. *Lewis v. State*, 332 Md. 639, 641, 632 A.2d 1175, 1176 (1993). Modeled after the Jury Selection and Service Act of 1968, 28 U.S.C. §§ 1861–1869 (1994), the selection process set forth in that subtitle necessarily embodies the Sixth Amendment's right to an impartial jury. It must be cautioned, however, that, separate and apart from constitutional considerations, these rights are statutory in nature. Ordinarily, their violation may only be vindicated by invocation of the statutorily-prescribed remedy.

In achieving an impartial jury, the process commences with an array composed of a fair cross-section of the community. *See Taylor v. Louisiana*, 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975). These individuals are then screened by various mechanisms put into place by Title 8, Subtitle 2 to determine their eligibility for jury service. The guidelines set forth in CJ § 8–207, which delineate the minimum qualifications for service, are the means by which the selection of a representative venire is effected. Anyone disqualified thereunder as a result of a response elicited on the qualification questionnaire or during the juror orientation is automatically excused from service. Those remaining are then "screened" a third time through *voir dire* examination. *See Boyd*, 341 Md. at 441, 671 A.2d at 38 ("Maryland courts screen juror qualifications on at least three levels: a statutorily-required qualification form, appearance before the jury judge or commissioner at the courthouse, and the trial judge's observance of each juror during the *voir dire*."). The timing and ability of a party to challenge jurors and the jury selection process are circumscribed by CJ § 8–211. Subsection (a) requires that a

challenge to selection procedures in a criminal case be made *before voir dire examination begins,* by motion to dismiss the indictment or stay the proceedings on the ground of substantial failure to comply with the procedures. Subsection (e) further delimits the ability to mount an attack against a particular juror by stating that the procedures described in CJ § 8–211 are "the exclusive means by which a person accused of a crime, the State's Attorney, or a party in a civil case may challenge any jury on the ground that the jury was not selected in conformity with the provisions of this title," including CJ § 8–207. It adds: "Except as to constitutional questions, nothing contained in this title constitutes grounds for postconviction relief under the provisions of Article 27, §§ 645A–645J of the Code." Thus, if a party interposes a challenge to a juror prior to *voir dire* based upon a failure to meet the minimum statutory requirements, the juror must be excused; the trial court has no discretion to qualify the juror. If, however, *voir dire* has commenced, as we shall explain, *infra,* any challenge made thereafter ordinarily must be accompanied by a demonstration of probable bias before the attack will succeed. The reason for this is clear: the statute unambiguously states that, prior to *voir dire,* jurors who are not qualified to sit fail to meet a requirement of CJ § 8–207. Afterward, the opponent has lost the statutory remedy and must labor under constitutional or common law principles. While we recognize that this narrow statutory period places a burden upon defendants in mounting post-*voir dire* challenges, it ensures that they do not frustrate the goal of finality in judicial decision-making. *See Davis,* 333 Md. at 40, 633 A.2d at 873 (It is the "justice system's obligation to provide litigants with both an impartial as well as efficient method of administering justice.").

We find support for this reasoning in *United States v. Boney,* 977 F.2d 624 (D.C.Cir.1992). In that case, before the defendants were sentenced, but after rendition of the verdict, it was discovered that the jury foreman was a convicted felon. A motion for new trial was denied. Addressing the defendants' statutory remedies under 28 U.S.C. §§ 1865–1867, the

United States Court of Appeals for the District of Columbia Circuit opined that the statute was inapplicable for two reasons: time and substance. The court noted that an objection made after trial, as in that case, fell outside 28 U.S.C. § 1867(a), which requires a defendant to object "before the voir dire examination begins, or within seven days after the defendant discovered or could have discovered, by the exercise of diligence, the grounds therefor[ ], whichever is earlier." 977 F.2d at 633. Failure to challenge properly the jury for improper selection waives the issue. 28 U.S.C. § 1867(e) (Section 1867 procedures are the "exclusive means" by which objections may be lodged.). Furthermore, the court reasoned, the cited provisions "address a different problem—the procedures by which the district court should administer the jury selection process. . . . [W]hen a juror fails to disclose his felon status . . ., no defect in the court's jury selection process occurs." *Id.* The court went on to state that, to the extent that 28 U.S.C. §§ 1865–1867 were germane,

> "they counsel against any rule that would lead to automatic reversal. The statutory scheme permits a conviction to stand in the face of an untimely allegation that the district court allowed a felon juror to serve in violation of the proper jury selection process. For example, if a juror acknowledged his felon status on the jury qualification form but was permitted to serve in violation of § 1865, § 1867 would bar an untimely challenge to his service. *See, e.g., United States v. Uribe,* 890 F.2d 554, 561 (1st Cir.1989) ("Like so many statutory rights, the right to exclude felons must be affirmatively invoked."). To be sure, § 1865 evinces a congressional purpose to restrict the service of felons on juries. The strict procedural limitations of § 1867, however, make abundantly clear that other values, such as judicial efficiency and finality, tempered Congress'[s] desire to bar felon-jurors and led Congress to reject a rule of *per se* reversal."

*Id.*

Normally, therefore, a challenge, as in the case *sub judice,* to a prospective juror once *voir dire* has begun or to an impanelled juror, does not trigger the provisions of Subtitle 2

of CJ Title 8, unless the challenge is constitutionally-based. CJ § 8–211 sets forth the way in which a defendant may challenge a juror on statutory grounds—by motion prior to *voir dire*. The language is clear and very specific. Failure to file such a motion results in waiver of the statutory remedies provided in CJ § 8–211(d).

■ It is undisputed that Hunt made no motion at any time prior to the commencement of *voir dire* (or after, for that matter). He concededly raises this issue for the first time in his second petition for post-conviction relief. He is, therefore, in no position to avail himself of CJ § 8–207, regardless of the reason for the delay, and his present reliance on that statutory provision is misplaced.

■ The Sixth Amendment's guarantee of a fair trial and impartial jury is the touchstone of our justice system.[9] What is required of jurors is that they be without bias or prejudice for or against the defendant and that their minds be free to hear and impartially consider the evidence and render a fair verdict thereon. *Bristow v. State*, 242 Md. 283, 289, 219 A.2d 33, 36 (1966); *see also Kujawa v. Baltimore Transit Co.*, 224 Md. 195, 201, 167 A.2d 96, 98 (1961); *Baltimore Radio Show, Inc. v. State*, 193 Md. 300, 328, 67 A.2d 497, 510 (1949), *cert. denied*, 338 U.S. 912, 70 S.Ct. 252, 94 L.Ed. 562 (1950). Furthermore, " '[b]ias on the part of prospective jurors will *never* be presumed, and the challenging party bears the burden of presenting facts ... which would give rise to a showing of actual prejudice.' " *Davis*, 333 Md. at 38, 633 A.2d at 873 (emphasis added)(quoting *Borman v. State*, 1 Md.App. 276, 279, 229 A.2d 440, 441–42 (1967)). If a criminal defendant undertakes to challenge a juror on grounds of bias, the attack must be affirmatively advanced at the time of trial. It may not be raised for the first time in a collateral attack upon the conviction and/or sentence.

---

**9.** The Sixth Amendment is applicable to the States through the Fourteenth Amendment. *Duncan v. Louisiana,* 391 U.S. 145, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968).

■■■ Because Hunt has lost his ability to challenge juror Void both because of the untimeliness of his challenge under CJ § 8–207 and because of his failure to demonstrate bias at trial, he has waived consideration of the matter in this proceeding. We may, however, and Hunt asks that we do, excuse these procedural defaults under the discretion granted by Md. Rule 8–131. We shall decline that invitation because we are not persuaded that juror Void's presence on the panel deprived Hunt of a fair trial. *See Walker, supra,* 343 Md. at 648, 649–50, 684 A.2d at 438, 439. The pending misdemeanor charge against juror Void does not demonstrate a probability of bias against Hunt. Moreover, the fact of juror Void's pending charge could have been known had Hunt's resentencing counsel conducted the very investigation undertaken by the federal public defender. It is undeniable that defense counsel had access to the pertinent records from Criminal Justice Information System ("CJIS") see Md. Code (1957, 1987 Repl. Vol., 1988 Supp.), Art. 27, §§ 743, et seq.,[10] or the District Court itself at the time of Hunt's resentencing, and their failure to utilize them to Hunt's advantage, for whatever reason, is a default that we will not excuse.

## B

### Patrick Russ

Prior to being summonsed, Mr. Russ was also required to complete a Qualification Questionnaire for Jury Service. On it he was asked whether he had been the victim of a crime within the previous year. He responded in the negative, when, in fact, within the relevant time period, his house had been burglarized.[11] Again, on *voir dire,* he was asked, "[H]as any member of this panel or their families or their close friends ever been the victim of a crime of violence?" Mr. Russ did not respond, either affirmatively or negatively. Testifying at the

---

**10.** *See also* COMAR 12.15.01.12B(2), which authorizes the dissemination of conviction and nonconviction criminal history record information "[f]or the purpose of the defense of a client in a pending criminal proceeding" to the Maryland Public Defender and defense counsel of record.

**11.** He had also appeared as a State's witness at the trial of the person charged with the housebreaking.

hearing on Hunt's second petition for post-conviction relief, he explained his nondisclosure:

"A. Well, this was—that was my first time ever being on a trial and I was nervous, and I just didn't think with what I responded."

On cross-examination, Mr. Russ conceded that he considered the crime to have been one of violence, but denied having an ulterior motive or a desire to hurt anyone in not disclosing the fact of his victimization.

Hunt challenges Mr. Russ's presence on the panel that resentenced him, stating that his intentional nondisclosure gives rise to a presumption of bias. Specifically, he states, "Juror Russ's status as a victim of a violent crime reasonably would have made him harsh on crime." He adds further that, because the State failed to produce evidence to rebut this presumption, he is entitled to a new sentencing hearing. We disagree.

■■■ Under the principles outlined *supra*, Hunt's ability to challenge Mr. Russ's presence on the jury is limited by waiver principles. Looking, as we must, to pertinent case law, statutes, and rules, *see Curtis*, 284 Md. at 150, 395 A.2d at 474, we note that, in order to mount a successful attack against the juror, Hunt was required to demonstrate that the fact of Mr. Russ's victimization would have provided a basis upon which to challenge him for cause. He failed to produce any evidence that established Mr. Russ's predisposition. Instead, he relied upon the proposition that nondisclosure automatically begets entitlement to a new sentencing hearing. In so doing, he did not satisfy his burden of proof. Thus, as with juror Void, Hunt has waived the right to raise the issue at this stage in the proceedings. Further, this procedural default precludes any consideration of the issue, since, in the absence of any proof of bias on the part of Mr. Russ, there was no showing that this default caused any prejudice to Hunt. *See Walker*, 343 Md. at 648, 649–50, 684 A.2d at 438, 439.

We hold that Hunt's failure to avail himself of the various remedies at his disposal during trial resulted from inexcusable procedural defaults that provide him with no foundation upon

which to predicate a challenge against jurors Void and Russ in the instant collateral attack upon his conviction and sentence.

### III.

Hunt challenges both the reasonable doubt instruction given at his trial and that given at his resentencing. Before we address Hunt's claims in respect thereto, we shall set forth those instructions in their entirety.

During the guilt/innocence phase of the trial, the court instructed the jury as follows:

"The State has the responsibility to offer you proof to overcome the presumption of innocence and to prove that the Defendant is guilty of the crimes with which he is charged. The degree of proof that is necessary for the State to produce is proof that a Defendant is guilty beyond a reasonable doubt. The Defendant does not have the burden of proving his innocence or producing any evidence. The State must prove or must establish by proof every material fact as to the guilt of the Defendant beyond a reasonable doubt. This does not mean that the State must prove a Defendant guilty beyond all possible doubt or to an absolute or mathematical certainty. The evidence in a criminal case need not be that certain but it must establish guilt beyond a reasonable doubt.

A reasonable doubt is not a difficult term to explain and perhaps can best be defined by attaching to the words reasonable doubt their ordinary meaning. A reasonable doubt is a doubt based on a reason, not on a doubt which is illogical or capricious or based on mere speculation but rather a doubt for which you find there exists a sound and logical reason.

Reasonable doubt has also been defined as follows: If after considering all the facts and the law of the case you can say that you have an abiding belief that the Defendant is guilty, a belief such as you would be willing to act upon in an important matter relating to the affairs of your own life, then you have no reasonable doubt.

Stating the same proposition just a little differently, the evidence is sufficient to remove a reasonable doubt when it convinces you as ordinarily prudent people that what the State is seeking to prove is true to the degree that you would be willing to act upon this belief in an important matter in your own lives.

In the final ... analysis, in order to sustain a verdict of guilty the evidence need not ... eliminate from your minds every conceivable doubt based on mere guesswork or suspicion but must eliminate from your minds any doubt based on a sound and logical reason."

At Hunt's resentencing, the trial court gave this instruction: "Reasonable doubt occurs when the evidence is sufficient to remove a reasonable doubt when it convinces you as ordinarily prudent people that what the [S]tate is seeking to prove is true to the degree that you would be willing to act upon this belief in an important matter in your own life. That is the explanation with respect to reasonable doubt. When you are convinced, as ordinarily prudent people, that what the [S]tate is seeking to prove is true to the degree that you would be willing to act upon this belief in an important matter in your on [sic] life."

 The "knowing and intelligent" waiver concept is not applicable to the failure to object to an erroneous jury instruction. *Davis v. State,* 285 Md. 19, 35, 400 A.2d 406, 414 (1979). Indeed, we have consistently held that the failure to challenge a jury instruction in accord with Md. Rule 4–325(e) [11] will act as a bar to any subsequent assignment of error thereto. *See Walker, supra,* 343 Md. at 646–47, 684 A.2d at 437–38, and cases cited therein. Hunt concedes that he did not object to the reasonable doubt instructions following their reading to the respective juries and that he has not previously presented

---

**11.** That rule mandates, in relevant part: "**Objection.**—No party may assign as error the giving or the failure to give an instruction unless the party objects on the record promptly after the court instructs the jury, stating distinctly the matter to which the party objects and the grounds of the objection."

this issue for appellate consideration. He asserts, however, that he has not waived his right to present these challenges because, prior to rendition of this Court's decision in *Wills v. State*, 329 Md. 370, 620 A.2d 295 (1993), there was "no legal basis" upon which to raise this issue and any such challenge "would not have prevailed under existing law." Because *Wills* allegedly "recognized a 'substantive standard not theretofore recognized,'" within the meaning of Art. 27, § 645A(d),[12] he continues, his assignment of error with respect to the reasonable doubt instructions may not be deemed to have been waived. We perceive no merit in this argument, and explain.

Hunt asserts that an instruction that defines reasonable doubt in relationship to that kind of evidence upon which the jurors would be willing to act in important matters in their own lives allows a jury to predicate a finding of guilt upon less proof than proof beyond a reasonable doubt; the absence of "without hesitation" or "without reservation" language rendered the instructions fatally flawed. In *Wills*, while we acknowledged that "the reasonable doubt standard is difficult to explain," 329 Md. at 382, 620 A.2d at 301, we refused to adopt a boilerplate explanation of the term so long as, "when an explanation is given to the jury, it . . . does not tend to confuse, mislead or prejudice the accused." *Id.* Despite an expressed preference for certain language we considered useful in explicating the term "reasonable doubt," we stopped short of holding that phrases such as "without reservation," "without hesitation," or any other specific language, or "magic

---

12. That section provides:

 *"Decision that Constitution imposes standard not heretofore recognized.*—For the purposes of this subtitle and notwithstanding any other provision hereof, no allegation of error shall be deemed to have been finally litigated or waived where, subsequent to any decision upon the merits thereof or subsequent to any proceeding in which said allegation otherwise may have been waived, any court whose decisions are binding upon the lower courts of this State holds that the Constitution of the United States or of Maryland imposes upon State criminal proceedings a procedural or substantive standard not theretofore recognized, which such standard is intended to be applied retroactively and would thereby affect the validity of the petitioner's conviction or sentence."

words," must be included in the instruction for it to pass muster. Thus, despite Hunt's assertions to the contrary, our decision in *Wills* did not alter existing case law with respect to the criteria under which a challenge to a reasonable doubt instruction is to be presented. Consequently, his Art. 27, § 645A(d) argument is unavailing.

Having concluded that Hunt failed to preserve this issue adequately, we now consider whether we will excuse this procedural default under Md. Rule 8–131. We will not. Hunt had numerous opportunities to attack the propriety of the now-challenged instructions: after the jury was charged; on direct appeal from the conviction or resentencing, respectively; and before the circuit court in his first petition for post-conviction relief. Moreover, even if we were to accept that *Wills* "impose[d] upon State criminal proceedings a procedural or substantive standard not theretofore recognized," which we do not, Hunt has not directed us to a reason why he did not bring that decision to the circuit court's attention in a timely fashion. The decision in *Wills* was filed after the hearing in his first petition for post-conviction relief, but before the circuit court's decision thereon.[13] Despite having raised several evidentiary matters for the court's consideration in that interim, Hunt did not bring to its attention the *Wills* decision and the purported impact it had upon his case. Thus, we hold that Hunt's failure to challenge the reasonable doubt instructions previously bars him from presenting this issue for our consideration in this appeal.

### IV.

State's witness Aaron McNair testified that he saw Hunt shoot Officer Adolfo once in the chest and then run after him, shooting him again in the back. He also denied under oath that any promise had been made to him by the prosecution in exchange for that testimony. In his third and fourth assign-

---

**13.** Specifically, the hearing ended November 20, 1992, the decision was handed down on April 13, 1993, and *Wills v. State*, 329 Md. 370, 620 A.2d 295 (1993), was filed March 3, 1993.

ments of error, which we shall address in tandem, Hunt assails the State's procurement and the substantive truth of McNair's testimony, claiming that it was both false and obtained in exchange for a promise of leniency in McNair's own upcoming sentencing. Hunt contends that the alleged falsity of McNair's statements under oath, and the State's concomitant failure to reveal that "false testimony," could have affected the jury's verdict. Further, McNair's denial of promises made to him by the prosecution went to his credibility and, given the nature of his testimony, the existence of any promise renders it reasonably likely that the jury would not have relied upon that testimony in finding premeditation and deliberation.[14]

McNair's involvement in the instant case began on the night of the shooting, November 18, 1985, when he identified himself to the Baltimore City Police Department as an eyewitness. In January of 1986, charges of assault with intent to murder and the lesser-included offense of assault were brought against him in the Circuit Court for Baltimore City. In May of 1986, he pled guilty to assault; his sentencing was scheduled for July 16, 1986. In the interim, on June 5, 1986, McNair testified at a suppression hearing brought on Hunt's motion, which sought, among other things, the disclosure of any impeachment evidence with respect to the State's witnesses. There, McNair stated that he had been provided with no consideration by the Office of the State's Attorney for his involvement in the instant case. Following McNair's testimony, Assistant State's Attorney Timothy Doory addressed the court:

> "For the record, Your Honor, Mr. McNair's understanding of any promises or agreements is correct as far as the State is aware. Nothing was ever promised to him on his charges other than a recommendation that he be released on [his own] recog[nizance] on the charge of failure to obey."

This understanding was reiterated to the court by Mr. Doory the following day. At trial, on June 19, 1986, upon examina-

---

14. McNair was widely regarded as an important witness on the issue of the premeditation *vel non* of Hunt's actions in shooting Officer Adolfo.

tion by Assistant State's Attorney Sam Brave, McNair again testified that he had not been promised anything in return for his testimony against Hunt.[15]

Thereafter, Jack Lesser, the Assistant State's Attorney prosecuting McNair's case, received a memorandum from Sam Brave, the prosecutor in Hunt's case, on July 15, 1986. *In toto,* it read:

" OFFICE OF THE STATE'S ATTORNEY

MEMORANDUM

---

TO: JACK LESSER, TEAM CAPTAIN, PT. 06
FROM: SAM BRAVE, TEAM CAPTAIN, PT. 07[SB]
DATE: JULY 15TH, 1986
SUBJ: *STATE VS. AARON MCNAIR* (CASE NO: 28608021)

The above captioned case is scheduled for disposition on July 16, 1986 before Hon. John Carroll Byrnes.

It's my understanding that on May 21, 1986 the Defendant, Aaron McNair pled guilty to the 3rd Count of C.I. 28608021 (Assault) under a plea bargain in which the State is to recommend a cap of 18 months, otherwise to remain silent.

As you are aware, the Defendant, McNair recently testified for the State in the Flint Gregory Hunt Death Penalty case. His testimony was extremely important in establishing premeditation and was given without any specific promises from the State except that his cooperation with the State in this *important case* would be brought to the attention of Judge Byrnes at the time of his disposition on the assault conviction for whatever consideration Judge Byrnes feels is appropriate. As you recall, Tim Doory and I had you 'on call' in the Hunt case in case it became

---

15. McNair testified in a substantially similar manner at Hunt's resentencing.

necessary to establish these facts. Defense counsel, Steve Suser, is, of course, aware of the situation; in fact, Mr. Suser, at one point located Mr. McNair and instructed him to contact us.

I am sure Mr. Suser would have no objection to this information being made part of the record at disposition. Should Judge Byrnes feel that the record should be amplified by my direct testimony, I will be available.

cc: Stephen A. Suser, Esq." [16]

Hunt contends that there can be no other interpretation of the memorandum but that McNair had been assured that his cooperation would be made known to Judge Byrnes and that McNair lied when he testified to the lack of any such agreement. According to Hunt, the State's failure to reveal the alleged falsity of his denial of said agreement upon questioning tainted the proceedings. The jury, in his estimation, would not have returned a verdict of guilt had it known that McNair's testimony had been prompted by an interest in testifying in a manner favorable to the State.

Before we may remark upon the validity of either averment presented, we must per force consider the nature of the right and timing of its assertion to ascertain our ability to entertain these claims in the first instance. Hunt acknowledges that he has not heretofore advanced the matter of McNair's involvement in his case. Indeed, during the hearing on Hunt's second petition, his first post-conviction counsel acknowledged that, in furtherance of that petition, they made the deliberate decision to pursue claims related solely to the ineffective assistance of counsel. Operating under that frame of reference, McNair's involvement in the case and his consequent testimony, as well as that of other trial fact witnesses, was not the focus of their efforts. When questioned about the fact of McNair's involvement in the case, one of his first post-conviction counsel, Mr. Thomas Morrow, indicated that, "[i]f [he] felt

---

**16.** The following day, July 16, 1986, at McNair's sentencing, Judge Byrnes acknowledged receipt of this memorandum. McNair received a probationary disposition.

that Mr. McNair would have presented a material element of the issues which Ms. [Judith] Catterton [his co-counsel] and [he] were investigating and presenting, [he] certainly would have found a way to find an investigator" to locate McNair to interview him. He then added, "The truth of the matter is with the resources we had, I had enough ... digest[ing] the transcript of the ... resentencing without attempting to sit and brain storm [sic] every possible issue that I could see ... and that's why I didn't even think to go out and try to raise issues with potential witnesses." Rather, what post-conviction counsel did was allege in the first petition that:

> "Petitioner was denied his rights guaranteed under the Fifth, Eighth, and Fourteenth Amendments of the United States Constitution, the Maryland Declaration of Rights, and Maryland law by the State's refusal to comply with its discovery obligations in a timely fashion.
>
> Petitioner's original trial counsel made timely requests for the following information regarding a number of witnesses: 1) their Grand Jury testimony; 2) their prior criminal records; and 3) any promises of leniency accorded them by the State in exchange for their testimony against Petitioner....
>
> With regard to trial counsel's request that the State provide any promise of leniency given any of its witnesses in consideration of their testimony, the State responded by producing these witnesses to testify immediately before the jury was selected. Since the State itself would be a party to any promise given, it was incumbent upon the State itself to respond and not require defense counsel to rely upon the understanding and credibility of the witnesses involved to remember and recite promises given. Moreover, providing this information at the eleventh hour immediately before jury selection, did not provide counsel adequate opportunity to investigate and make use of this information."

At the hearing on the first petition, however, counsel failed to present any evidence in furtherance of the above claim.

██ Hunt's first post-conviction counsel made the tactical decision not to challenge the memorandum or McNair's testimony with respect to the existence *vel non* of an agreement with the State. Under the analysis recited in Part I., *supra*, the right alleged to have been violated—the right not to be convicted on false testimony—has never been recognized as being of the kind traditionally considered waivable only by knowing and intelligent action. Thus, Hunt is held to have waived it in the ordinary course of the litigation for failing to proffer a seasonable objection thereto.

As we previously indicated, "[a] defendant may forego a broad spectrum of rights which are deemed to fall within the category of tactical decisions [made] by counsel." *Curtis, supra,* 284 Md. at 147, 395 A.2d at 473; *see also Hardaway v. State,* 317 Md. 160, 169, 562 A.2d 1234, 1238 (1989); *Magwood,* 290 Md. at 622, 432 A.2d at 449–50; *Davis, supra,* 285 Md. at 35, 400 A.2d at 413–14. Many decisions made by authorized and competent counsel during the trial or appellate process will generally act to bind the defendant. *Walker,* 343 Md. at 643, 684 A.2d at 436; *Oken,* 343 Md. at 270, 681 A.2d at 37; *Treece v. State,* 313 Md. 665, 672, 547 A.2d 1054, 1057 (1988) (citing *Curtis* ); *State v. Calhoun,* 306 Md. 692, 703, 511 A.2d 461, 466 (1986), *cert. denied,* 480 U.S. 910, 107 S.Ct. 1339, 94 L.Ed.2d 528 (1987); *see State v. Thomas,* 328 Md. 541, 560, 616 A.2d 365, 374–75 (1992) (attorney's decisions during course of trial were product of professionally reasonable judgment consistent with defendant's constitutional guarantees of effective assistance of counsel), *cert. denied,* 508 U.S. 917, 113 S.Ct. 2359, 124 L.Ed.2d 266 (1993); *Cherry v. State,* 305 Md. 631, 649, 506 A.2d 228, 237 (1986) (" 'Under our adversary system, once a defendant has the assistance of counsel the vast array of trial decisions, strategic and tactical, ... rests with the accused and his attorney.' " (quoting *Estelle v. Williams, supra,* 425 U.S. at 512, 96 S.Ct. at 1697, 48 L.Ed.2d at 135)); *Williams, supra,* 292 Md. at 216, 438 A.2d at 1308 ("[A] defendant [is] in most situations bound by the tactical decisions, actions or inactions of his attorney."); *see also Nelson v. California,* 346 F.2d 73, 81 (9th Cir.) (counsel is manager of

case), *cert. denied,* 382 U.S. 964, 86 S.Ct. 452, 15 L.Ed.2d 367 (1965). Indeed, there is "the potential for chaos if every time counsel made a tactical decision ... the 'intelligently and knowingly' standard was triggered." *Oken,* 343 Md. at 270–71, 681 A.2d at 37. As we explained in *Curtis:*

> "In the broadest sense of the word, any tactical decision by counsel[ or] inaction by counsel ..., could be described as a 'waiver.' For example, an attorney must make numerous decisions in the course of a trial. Whenever he makes one, choosing to take or forego a particular action, the alternate choice could be said to have been waived."

284 Md. at 147–48, 395 A.2d at 473.

 Counsel in the first post-conviction case made the deliberate, tactical decision to remain silent in the face of numerous opportunities to raise the specter of the memorandum and challenge McNair's testimony with respect to an agreement with the State. Hunt, therefore, may only press this matter before us if we exercise our discretion to excuse its waiver. Md. Rule 8–131. We shall not. Hunt has made no showing of such prejudice as would have tainted the fairness of the proceeding. The "promise," if any, merely brought to Judge Byrnes's attention the fact that McNair cooperated in Hunt's case. The memorandum, therefore, was simply corroborative of actual events. Moreover, in the face of overwhelming evidence of Hunt's premeditation, the import Hunt ascribes to McNair's testimony has been greatly exaggerated.

Before the grand jury, McNair testified that he witnessed the struggle between Hunt and Officer Adolfo, the first shot, and the chase and subsequent shot. At trial and at the resentencing hearing, he testified in a substantially similar manner. At the hearing on Hunt's second petition, however, faced with recent admissions of his apparent mischaracterization of the events that transpired on the evening of November 18, 1985, McNair invoked his Fifth Amendment privilege against self-incrimination. Thereafter, Hunt called Maurice Bellan and Michael Widenhouse, investigators for the Office of the Federal Public Defender and the Maryland Public Defend-

er, respectively, to testify to the substance of their interviews with McNair, in which he admitted to falsely testifying to Hunt's agency in firing the second shot.

Mr. Bellan stated that, in late 1995, he had occasion to interview McNair. McNair "informed [him] on that day that he was mistaken when he previously testified that he actually saw the second shot of the deceased officer that evening." He continued:

"Mr. McNair indicated that he saw an individual running up an alley with an officer following him. He indicated that he saw this officer slam this individual up against a wall near a post. He indicated that he saw this individual push off the wall and in kind of one motion turn around and shoot the officer.

At that point where he saw that first shot, he indicated that he went to go grab his daughter ... to bring her inside the house...."

According to Mr. Bellan, McNair heard, but did not see, the second shot. On cross-examination, Mr. Bellan acknowledged that McNair had been plagued by nightmares of Hunt's impeding execution. Mr. Widenhouse, who participated in an interview of McNair on February 8, 1996, also indicated that McNair denied having witnessed the second shot. While McNair's affidavit stated that he had been having nightmares about Hunt's execution and sought a commutation of Hunt's sentence of death to life imprisonment without parole, Mr. Widenhouse indicated that the matter was not openly discussed during the interview.

McNair's testimony was elicited at Hunt's trial in order to provide evidence of Hunt's deliberate and premeditated actions in shooting Officer Adolfo. Whatever the parties' characterization of McNair's past and present recollection of the events leading up to Officer Adolfo's death, it was but one component of the State's case establishing that Hunt had the requisite premeditation to support a conviction for first-degree murder. That is to say, the fact that Hunt may or may not have chased the Officer as he fired the second shot is not

dispositive. It is well-settled that premeditation may be predicated upon the passage of "any amount of time sufficient to convince the trier of fact that the purpose to kill was not 'the immediate offspring of rashness and impetuous temper,' but was the product of a mind 'fully conscious of its own design.' " *Willey v. State,* 328 Md. 126, 133, 613 A.2d 956, 959 (1992). "If the killing results from a choice made as the result of thought, however short the struggle between the intention and the act, it is sufficient to characterize the crime as deliberate and premeditated murder." *Colvin v. State,* 299 Md. 88, 108, 472 A.2d 953, 963 (quoting *Tichnell v. State,* 287 Md. 695, 718, 415 A.2d 830, 842 (1980)), *cert. denied,* 469 U.S. 873, 105 S.Ct. 226, 83 L.Ed.2d 155 (1984). Thus, even if McNair failed to witness Hunt fire the second shot, ballistics tests revealed conclusively that the same gun, a .357 Ruger Blackhawk single-action revolver, fired both bullets, and it is the firing characteristics of this type of gun, i.e., its single-action design, that provided a basis upon which premeditation could be found. As was explained to the jury at the guilt/innocence trial:

> "Single action means to operate this weapon, the hammer must be cocked.... [With] a single action revolver you must cock the hammer and then pull the trigger. To get it to fire again, you must cock the hammer, the cylinder revolves and you pull the trigger. It is the operational mode of this particular weapon. The weapon does not function just by pulling the trigger. You must cock it then pull the trigger.... [I]t will hold the .357 magnum semijacketed cartridges, such as that were fired in this particular case." [17]

---

**17.** The concept was explained in a little more detail at the resentencing hearing in 1988:

> "[S]ingle action means that there is only one mode of operation that this weapon will fire. Many revolvers have two modes called a single action and a double action. This particular revolver has a single action. And what single action means is the way you go about discharging a weapon. Single action in this particular weapon means that you must pop the hammer back.... The gun is then cocked. To release the hammer and fire the weapon, you pull the

Hunt would have us believe that the methodical process undertaken in firing the weapon has no meaning. Simply stated, we are not persuaded. In order to fire the gun, Hunt took several deliberate and conscious actions to place it in an operational mode: He pulled the hammer of the weapon toward him. He pointed the weapon at Officer Adolfo, and he pulled the trigger. We reject the notion that this weapon, a .357 single-action revolver, may be fired in any other but a deliberate manner. Further, this Court has held that the delay between firing a first and second shot is enough time for reflection and decision to justify a finding of premeditation and deliberation. *See Wilson v. State,* 261 Md. 551, 276 A.2d 214 (1971); *Cummings v. State,* 223 Md. 606, 165 A.2d 886 (1960), *cert. denied,* 366 U.S. 922, 81 S.Ct. 1098, 6 L.Ed.2d 243 (1961); *Chisley v. State,* 202 Md. 87, 95 A.2d 577 (1953).

We hold that Hunt has inexcusably waived his right to challenge any aspect of McNair's involvement in these proceedings.

### V.

Hunt also decries the ineffectiveness of his attorneys in their submission of jury instructions that did not represent proper statements of law. Specifically, he finds fault with the instructions submitted on first-degree murder, and its attendant distinction from second-degree murder, and on the effect of voluntary intoxication, as it mitigates first-degree murder. We shall resolve the issue of both instructions in tandem, following a recitation of the instructions themselves, the offending parts emphasized.

---

trigger. That is what we refer to as single action, cocking it and pulling the trigger to fire.
. . . .
The second time [you pull the trigger], nothing will happen. The weapon is locked in a locking mode. You must pull the hammer back and pull the trigger each time you want the weapon to fire; pull the hammer back and pull the trigger. You can't just pull the trigger and discharge the weapon."

At trial, the court gave the following instruction on first-degree murder:

"Murder in the first degree is the willful, deliberate and premeditated killing of a human being without excuse, justification or mitigation.

Willful means that the act which caused the death was done intentionally and with purpose.

Deliberate means that there was a full and conscious knowledge of the intention and purpose to kill.

Premeditated means that the intention and purpose to kill preceded the killing by some appreciable time.

The first element that I have just defined, the act of killing was intentional, may be proven by circumstantial evidence. Very important circumstantial evidence which you should consider is the act itself which caused the death.

If you find the victim's death was caused by the Defendant's use of a deadly weapon against a vital part of the body of the deceased, you may conclude that the Defendant intended the natural result of such an act, that is, the death of the deceased.

Intention to kill then may be shown by proof that the act which caused the death of the deceased had as its natural consequence, natural result either death of the deceased or such serious bodily injury as would naturally result in death.

The second element, deliberation, requires proof that the act causing the death was not committed suddenly but was instead done after a conscious decision was made to carry out the act.

The third element, premeditation, requires proof that the conscious and deliberate intention to do the fatal act existed for an appreciable time before the act was done. The law does not require that the intention to kill existed [sic] for any considerable length of time before the fatal act. It is sufficient if there is time for the mind to think upon and consider the act and then determine to do it.

*The three words, willful, deliberate and premeditated connote the same general idea, the intention to kill.*

Applying these definitions to the facts of this case, if you find that the State has proved beyond a reasonable doubt that the Defendant intentionally killed the deceased without excuse and that this intentional killing was done with deliberation and with premeditation, then your verdict should be guilty of murder in the first degree.

On the other hand, if you find that the State has failed to prove beyond a reasonable doubt that the Defendant killed the deceased, the Defendant must be found not guilty. However, if you find that the State has proven beyond a reasonable doubt that the Defendant killed the deceased but failed to prove beyond a reasonable doubt that the killing was done intentionally and with deliberation and with premeditation, then your verdict should be not guilty of murder in the first degree. That then is the definition of first degree murder.

We next go to second degree murder. I might say that at this point that if the jury finds not guilty of first degree murder, the jury will go to second degree. If the jury finds guilty of first degree murder, then the jury will skip second degree murder and go on to the last two items that are listed on the sheet, the verdict sheet.

Second degree murder differs from first degree murder only by the absence of deliberation or premeditation. Therefore, if you find that the State has proved beyond a reasonable doubt that the Defendant intentionally killed the deceased without excuse but has failed to prove beyond a reasonable doubt that the killing was done with deliberation and with premeditation, then your verdict should be guilty of murder in the second degree. Now, that then is second degree murder."

The court then instructed as follows with respect to the mitigating character of voluntary intoxication upon first-degree murder:

"Now, let's go back with respect to first degree murder. This applies, what I'm telling now applies to first degree murder. With respect to murder in the first degree, one of

the elements which the State must prove is that the Defendant acted with the requisite specific intent to commit first degree murder.

I have already instructed you that in order for a person to be found guilty of an offense the [S]tate must prove each and every element of the offense charged beyond a reasonable doubt.

The Defendant in this case has been charged with the crime of first degree murder. Therefore, one of the elements which the State must prove is that the Defendant acted with the requisite specific intent to commit first degree murder.

*Generally, voluntary intoxication by drugs is no defense to a criminal charge. The only exception to this occurs when a defendant is charged with a crime requiring specific intent and the Defendant was so intoxicated that he was unable to formulate the required specific intent.*

*The fact that the Defendant may have been intoxicated at the time of the commission of the offense may be considered by you as bearing upon his state of mind.*

*For voluntary intoxication by drugs to be a defense to a crime, to a crime requiring specific intent, the impulse to commit the crime must arise after the intoxication from the drugs.*

*The issue in this case is not whether the Defendant was intoxicated at the time of the commission of the alleged crime, it is whether the Defendant was so intoxicated at the time the act was committed as to be incapable of forming the specific intent to commit first degree murder which is a necessary element of this offense that he's been charged with.*

*If, after a full and fair consideration of all the facts and circumstances in evidence, you find that the Defendant had been under the influence of drugs to the extent that he was without, without the capacity to form the specific intent which is a necessary element of this offense, then you must find the Defendant not guilty of first degree murder."*

As we have indicated, Hunt's assertions of a denial of effective assistance of counsel are made in reference to the submission by his trial counsel of the above-quoted instructions. He avers that the jury was confused when instructed upon the separate concepts of willfulness, deliberation, and premeditation, which were then improperly collapsed into one, i.e., the intent to kill. He adds that the jury was erroneously led to believe that his intoxication could be considered by them in determining whether he was incapable of forming the requisite specific intent, rather than being instructed that voluntary intoxication mitigated deliberate and premeditated action. According to Hunt, because "[a]ny reasonably competent attorney practicing criminal law . . . in Maryland would not have tendered a bad instruction on the effect of voluntary intoxication and [would] not have failed to object to the collapsing of the three . . . elements of first degree murder into one," he is entitled to a new trial.

Hunt previously raised this issue in his first petition for post-conviction relief. In it, he maintained that his trial counsel had been ineffective in failing to ensure that proper instructions were submitted to the jury.[18] The circuit court rejected this contention in his first petition, and this Court denied Hunt's timely application to appeal from that denial of relief. As such, we are hard-pressed to consider this issue as anything but "finally litigated," within the traditional meaning of that concept. A claim of error is considered finally litigated when this Court or the Court of Special Appeals has rendered a decision on the merits thereof either on direct appeal or upon consideration of an application for leave to appeal filed pursuant to the Post Conviction Procedure Act. *See State v. Thomas*, 325 Md. 160, 177, 599 A.2d 1171, 1179

---

18. Specifically, the petition read, in relevant part:

"18. Counsel failed to object to the Court's instructions on murder which failed to properly state the law. The Court failed to define malice and failed to instruct the jury that malice is a necessary element of both first and second degree murder. Further, in defining unlawful homicide of the first and second degree, the Court failed to exclude killings committed with 'mitigation.' "

(1992); *Calhoun, supra,* 306 Md. at 726, 511 A.2d at 478; *Veney v. Warden, Maryland Penitentiary,* 259 Md. 437, 453, 271 A.2d 133, 142 (1970); *Hall v. Warden of the Maryland Penitentiary,* 244 Md. 731, 732–33, 225 A.2d 273, 274 (1967); *Baldwin v. Warden of the Maryland Penitentiary,* 243 Md. 326, 328, 221 A.2d 73, 74 (1966); *Husk v. Warden of Maryland Penitentiary,* 240 Md. 353, 354, 214 A.2d 139, 140 (1965); *Lee v. Warden, Maryland Penitentiary,* 240 Md. 721, 724, 214 A.2d 142, 143 (1965); *Boucher v. Warden, Maryland Penitentiary,* 5 Md.App. 51, 57, 245 A.2d 420, 424 (1968). Therefore, in the context of the instant post-conviction proceeding, Hunt may not raise this issue again. See Art. 27, § 645A(b), which provides:

> *"When allegation of error deemed to be finally litigated.*—For the purposes of this subtitle, an allegation of error shall be deemed to be finally litigated when an appellate court of the State has rendered a decision on the merits thereof, either upon direct appeal or upon any consideration of an application for leave to appeal filed pursuant to § 645–I of this subtitle; or when a court of original jurisdiction, after a full and fair hearing, has rendered a decision on the merits thereof upon a petition for a writ of habeas corpus or a writ of error coram nobis, unless said decision upon the merits of such petition is clearly erroneous."

## VI.

For the reasons set forth above, we hold that Hunt is not entitled to relief on any of the claims set forth in his second petition for post-conviction relief.

**JUDGMENT AFFIRMED.**

Dissenting Opinion by BELL, J.

BELL, Judge, dissenting opinion.

The petitioner, Flint Gregory Hunt, was sentenced to death, in 1988. Subsequently, it was discovered that two members of the jury intentionally withheld information pertinent to their qualifications to serve on that jury, despite having been exam-

ined on the *voir dire* concerning the subject. One of the jurors, Diana Void, withheld information that she had been charged with misdemeanor theft, which, if known, absolutely and without any doubt whatever, would have resulted in her disqualification from service not only in the *Hunt* case, but in any case. Ms. Void withheld the information on two occasions—during the jury orientation process, at which she was asked whether she was the subject of any pending charges, and during the *voir dire* process. The other juror, Patrick Russ, withheld information that he had been a victim of a burglary within the past year. Rather than being automatically disqualifying, that information rendered Mr. Russ subject to being stricken for cause. Because neither Ms. Void nor Mr. Russ answered the questions honestly, and the petitioner had no idea that their answers were false, neither was challenged by the petitioner and, thus, they were permitted to serve on the jury that sentenced him to death.

The majority holds that the petitioner may not, at this late date, assert the right to an impartial jury; according to it, that right being one that does not have to comply with the *Johnson v. Zerbst*[1] standard, *i.e.*, be knowing and voluntary, the petitioner has waived that right, essentially by inaction—by not discovering the jurors' lack of candor prior to taking a direct appeal. It also holds that, in any event, in order to be entitled to a new capital sentencing hearing, the petitioner must prove that jurors Void and Russ "actually" were biased, which he failed to do. The majority is wrong on both accounts.

## I

Maryland's post-conviction statute, Maryland Code (1957, 1996 Repl.Vol.) Art. 27, § 645A(c), provides:

*When allegation of error deemed to have been waived.*—

(1) For the purposes of this subtitle, an allegation of error shall be deemed to be waived when a petitioner could have made, but intelligently and knowingly failed to make, such

---

1. *Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461, 1466 (1938). *See* also *Fay v. Noia,* 372 U.S. 391, 439, 83 S.Ct. 822, 849, 9 L.Ed.2d 837, 869 (1963).

allegation before trial, at trial, on direct appeal (whether or not the petitioner actually took such an appeal), in an application for leave to appeal a conviction based on a guilty plea, in any habeas corpus or coram nobis proceeding actually instituted by said petitioner, in a prior petition under this subtitle, or in any other proceeding actually instituted by said petitioner, unless the failure to make such an allegation shall be excused because of special circumstances. The burden of proving the existence of such special circumstances shall be upon petitioner.

(2) When an allegation of error could have been made by a petitioner before trial, at trial, on direct appeal (whether or not said petitioner actually took such an appeal), in an application for leave to appeal a conviction based on a guilty plea, in any habeas corpus or coram nobis proceeding actually instituted by said petitioner, in a prior petition under this subtitle, or in any other proceeding actually instituted by said petitioner, but was not in fact so made, there shall be a rebuttable presumption that said petitioner intelligently and knowingly failed to make such allegation.

This Court has interpreted this section as only applicable when fundamental rights are involved. *Curtis v. State*, 284 Md. 132, 149–50, 395 A.2d 464, 474 (1978). In that case, we stated:

[W]e believe that the Legislature, when it spoke of 'waiver' in subsection (c) of Art. 27, § 645A, was using the term in a narrow sense. It intended that subsection (c), with its 'intelligent and knowing' standard, be applicable only in those circumstances where the concept of *Johnson v. Zerbst* and *Fay v. Noia* was applicable. Other situations are beyond the scope of subsection (c), to be governed by case law or any pertinent statutes or rules.

*Id. See also State v. Calhoun,* 306 Md. 692, 703, 511 A.2d 461, 466 (1986).

The Sixth Amendment to the United States Constitution guarantees that "in all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury." This provision is made applicable to the states through

the Fourteenth Amendment. *Gideon v. Wainwright,* 372 U.S. 335, 342, 83 S.Ct. 792, 795, 9 L.Ed.2d 799 (1963) (holding "a provision of the Bill of Rights which is 'fundamental and essential to a fair trial' is made obligatory upon the states by the Fourteenth Amendment"). *See also Irvin v. Dowd,* 366 U.S. 717, 722, 81 S.Ct. 1639, 1642, 6 L.Ed.2d 751, 755 (1961) (stating that the failure to provide an impartial jury "violates even the minimal standards of due process"). In that regard, this Court has stated that "[t]here can be no doubt that in this country and in this State there is ... the fundamental right to a fair and impartial jury trial...." *Davidson v. Miller,* 276 Md. 54, 68–69, 344 A.2d 422, 431–32 (1975).

Quite clearly, the petitioner is asserting the right to an impartial jury, a right that is "fundamental and essential to a fair trial." Accordingly, because this is an unquestionably fundamental right, applying § 645A (c), its waiver cannot be accomplished unless two elements are met: (1) the petitioner must have been able to assert the claim previously and (2) he must have "intelligently" and "knowingly" failed to do so. Neither element has been met in this case.

The petitioner could not have raised this claim previously. It was not until, as a last ditch effort to save the petitioner, a Federal Public Defender investigator just happened to run an unrequired record check on the jurors, that he was made aware that there was a basis for such a claim. Surely, this Court cannot conclude that it is possible for one to assert a right when he or she has absolutely no knowledge that it exists. Only Ms. Void and Mr. Russ knew that they had withheld information material to the *voir dire* process. The petitioner simply had no way of knowing when the jury was impaneled that it was violative of the fundamental right to an impartial jury. As soon as knowledge that the process was flawed became known to him, he moved, on that basis, for a new sentencing hearing. In short, the petitioner could not have raised the impartial jury issue prior to his second post conviction petition.

To hold that the petitioner's counsel could have found the information by running a background check on all the jurors

using the same system that the investigator used is preposterous. Such a holding would indicate that counsel and defendants can no longer rely on the integrity of the jury selection process.

And because the petitioner was completely unaware that his right to an impartial jury had been infringed, he could not have "intelligently and knowingly" waived it. *See Curtis*, 284 Md. at 139, 395 A.2d at 468–69 (a defendant may not intelligently and knowingly waive a post conviction claim unless he or she both was previously aware of, and understood, it); *Washington v. Warden*, 243 Md. 316, 321–22, 220 A.2d 607, 610 (1966)(facts showing a lack of comprehension by the petitioner adequately rebuts the presumption of an intelligent and knowing waiver).

Again, the petitioner was completely ignorant of the fact that two members of the jury withheld pertinent information pertaining to their qualifications to serve, during both jury orientation and *voir dire*. A person cannot intelligently and knowingly waive that which is not known to exist. To hold otherwise makes a mockery of, and undermines, the entire justice system.

## II

Because, by failing to answer truthfully all questions put to them on *voir dire*, they both knowingly concealed information bearing on their qualification to serve as jurors in the case being tried, jurors Void and Russ must be presumed to have been biased as a matter of law.[2] In *Clark v. United States*, 289 U.S. 1, 53 S.Ct. 465, 77 L.Ed. 993 (1933), the Supreme Court recognized that a presumption of bias may arise when a juror knowingly conceals information. The Court stated, *albeit* in dicta, that disingenuous concealment by a juror or a

---

**2.** In the case of juror Void, it is of some consequence to this discussion that she was the subject of some controversy during the impanelling of the resentencing jury. It was the petitioner's contention that she was a pro-death juror. The majority concluded that, while she was confused and often inconsistent, she was not a pro-death juror. *Hunt v. State*, 321 Md. 387, 418–19, 583 A.2d 218, 233 (1990).

"willfully evasive or knowingly untrue" answer furnishes the basis for a finding of bias and for declaring the trial a "mere sterility." *Id.* at 11, 53 S.Ct. at 468, 77 L.Ed. at 998. *See United States v. Wood,* 299 U.S. 123, 133, 57 S.Ct. 177, 179, 81 L.Ed. 78, 81–82 (1936)(bias of a juror may and under certain circumstances must be presumed as a matter of law); *Smith v. Phillips,* 455 U.S. 209, 222, 102 S.Ct. 940, 948, 71 L.Ed.2d 78, 89 (1982) (O'Connor, J., concurring) (the implied bias standard should be applied in appropriate circumstances; "in certain instances a hearing may be inadequate for uncovering a juror's biases, leaving serious question whether the trial court had subjected the defendant to manifestly unjust procedures resulting in a miscarriage of justice").

In *McDonough Power Equipment, Inc. v. Greenwood,* 464 U.S. 548, 104 S.Ct. 845, 78 L.Ed.2d 663 (1984), the Supreme Court developed a two-part test for determining whether a juror's untruthful *voir dire* responses warranted the grant of a new trial:

> [T]o obtain a new trial in such a situation, a party must first demonstrate that a juror failed to answer honestly a material question on voir dire, and then further show that a correct response would have provided a valid basis for a challenge for cause.

*Id.* at 556, 104 S.Ct. at 850, 78 L.Ed.2d at 671. In a concurring opinion, Mr. Justice Brennan observed, "[b]ecause the bias of a juror will rarely be admitted by the juror himself, . . . it necessarily must be inferred from surrounding facts and circumstances." *Id.* at 558, 104 S.Ct. at 851, 78 L.Ed.2d at 673. Thus, under *McDonough,* juror bias is conclusively shown whenever a juror knowingly fails to disclose material information giving rise to a challenge for cause.[3]

Several courts have adopted the *McDonough* standard. *State v. Thomas,* 830 P.2d 243, 245–46 (Utah 1992) (juror bias presumed because juror failed to disclose prior crime of

---

**3.** Prior to the decision in *McDonough Power Equipment, Inc. v. Greenwood,* 464 U.S. 548, 104 S.Ct. 845, 78 L.Ed.2d 663 (1984), the United States Court of Appeals for the Fourth Circuit, recognizing the injustice

violence against her son); *Burton v. Johnson*, 948 F.2d 1150, 1158 (10th Cir.1991); *United States v. Colombo*, 869 F.2d 149, 151 (2nd Cir.1989); *United States v. Scott*, 854 F.2d 697, 699–700 (5th Cir.1988) (a juror may not conceal material facts disqualifying him simply because he sincerely believes that he can be fair in spite of them); *United States v. Perkins*, 748 F.2d 1519 (11th Cir.1984). *See also Burkett v. State*, 21 Md.App. 438, 319 A.2d 845 (1974) (implying that a juror's intentional withholding of information during *voir dire* leads to a presumption of bias).

In the present case, both jurors knowingly withheld information pertinent to their qualifications to serve as jurors during the *voir dire* examination. Indeed, had they answered the questions honestly, the petitioner could have moved to exclude juror Void as a matter of right and sought to have Russ struck for cause.

## III

Alternatively, in this case, *there* are two additional, independent bases upon which the bias of the jurors must be presumed.

---

that may occur when a juror gives false or misleading answers during *voir dire,* applied a similar test to reach the same result. *United States v. Bynum,* 634 F.2d 768 (4th Cir.1980). In that case, a juror who served on two separate panels in different criminal cases had a brother who had been convicted of bank robbery, a sister-in-law convicted of narcotics violations, and a nephew convicted of bank robbery. During the *voir dire* examination in the first case, the juror did not respond to the question whether any person to whom he felt close had ever been a defendant or victim of a crime. Likewise, in the second case, he failed to answer, on *voir dire,* whether he or any close family relatives had ever been convicted of a crime or subject to any criminal investigation. After guilty verdicts were returned in both cases, the juror's failure to disclose came to the court's attention and special hearings on the matter were held. Despite the juror's testimony that he did not feel especially close to his brother, nephew or sister and therefore had responded truthfully to the questions, the court concluded that the juror knew the questions required him to at least reveal his brother's conviction. Accordingly, it reversed both convictions, reasoning that "when possible non-objectivity is secreted and compounded by the deliberate untruthfulness of a potential juror's answers on *voir dire,* the result is deprivation of the defendant's rights to a fair trial." *Id.* at 771.

First, Void's bias must be presumed because the information she withheld during *voir dire* would have disqualified her, statutorily, from jury service. By enacting Maryland Code, (1957, 1996 Repl.Vol.) § 8–207(b)(5) of the Courts & Judicial Proceedings Article, the Maryland General Assembly has sought to protect a defendant's right to trial by an impartial jury by prohibiting certain categories of persons from sitting on juries. That section provides:

(b) *Grounds for disqualifications.*—A person is qualified to serve as a juror unless he:

* * *

(5) Has a charge pending against him for a crime punishable by a fine of more than $500, or by imprisonment for more than six months, or both,or has been convicted of such crime and has received a sentence of a fine of more than $500, or of imprisonment for more than six months,or both, and has not been pardoned;

* * *

Courts have recognized that bias must be presumed and a new trial ordered when an individual who falls within the category of statutorily disqualified persons serves on a jury and that fact was not revealed during *voir dire*. *See Gladhill v. General Motors Corp.*, 743 F.2d 1049, 1050–51 (4th Cir.1984) (new trial ordered where a juror was legally disqualified from serving on the jury regardless of the jurors subjective qualifications; showing of actual bias not required; bias presumed because the law itself precluded the individual from sitting on the jury); *Thomas v. Texas*, 796 S.W.2d 196 (Tex.Crim.1990) (new trial ordered in capital murder case without a showing of actual prejudice where jury included juror who was statutorily disqualified); *Commonwealth v. Kelly*, 415 Pa.Super. 248, 251–52, 609 A.2d 175 (1992) (defendant entitled to a new trial without showing of actual prejudice where juror falsely stated that he had never been convicted of a crime, when in reality he had and was therefore statutorily disqualified); *State v. Williams*, 190 N.J.Super. 111, 462 A.2d 182 (A.D.1983)(new

trial granted where statutorily disqualified juror sat on jury; defendant not required to show actual prejudice).

This Court, like those just mentioned, should defer to the legislative determination that persons, like Void, charged with prescribed criminal conduct, are unfit to sit on a jury and, as a consequence, grant the petitioner a new capital sentencing hearing. Indeed, had Void revealed during *voir dire* that she had been charged with theft, she automatically would have been struck, as she was statutorily disqualified.

A similar result obtains in the case of Russ, who concealed the fact that he was a victim of a violent crime. It is well established that, where there are similarities between the juror's experiences and the facts at trial, the juror's bias may be presumed. *Hunley v. Godinez,* 975 F.2d 316, 319 (7th Cir.1992) ("courts have presumed bias in cases where the prospective juror has been the victim of a crime or has experienced a situation similar to the one at issue in the trial.") *See Burton v. Johnson,* 948 F.2d 1150 (10th Cir.1991) (bias presumed where juror who was victim of spousal abuse sat in a murder trial and the defendant's defense was battered wife syndrome); *United States v. Eubanks,* 591 F.2d 513, 517 (9th Cir.1979) (court presumed bias where juror's sons were heroin users and in the case being tried defendants were charged with distributing heroin); *United States ex rel. De Vita v. McCorkle,* 248 F.2d 1, 8 (3rd Cir.1957) (in a robbery case the court presumed bias where juror was a victim of robbery).

Here, Russ was a victim of a violent crime. His past experience, which occurred within only one year of his jury service, connects Russ to the case in a way that will most likely prevent him from being impartial. Moreover, the State has not offered any evidence to indicate his impartiality.