Bruce R. BANTHER, Defendant
Below, Appellant,

v.

STATE of Delaware, Plaintiff
Below, Appellee.

No. 69,1999.

Supreme Court of Delaware.

Submitted: April 8, 2003.
Decided: May 21, 2003.

Edward Gill, Esquire (argued), Georgetown, Delaware, and Kevin M. Howard, Esquire, Young & Malmberg, Dover, Delaware, for appellant.

John Williams, Esquire (argued) and Marie O'Connor Graham, Esquire, Department of Justice, Dover, Delaware, for appellee.

Before VEASEY, Chief Justice, WALSH,[1] HOLLAND, BERGER, and STEELE, Justices (constituting the Court en Banc).

HOLLAND, Justice.

This is the direct appeal of the defendant-appellant, Bruce R. Banther. Following a jury trial in the Superior Court, Banther was convicted of Murder in the First Degree, Possession of a Deadly Weapon During the Commission of a Felony, Forgery in the Second Degree and Felony Theft. The Superior Court sentenced Banther to life in prison for the Murder in the First Degree conviction.[2]

Banther has raised five issues on appeal. First, he alleges that the Superior Court committed reversible error by admitting into evidence statements obtained from him by the police in violation of his *Miranda*[3] rights. Second, Banther asserts that the Superior Court committed reversible error in its rulings regarding redaction of his video recorded statements. Third, Banther contends that the Superior Court erred in denying his right to compulsory process by failing to allow him to call John Schmitz as a witness. Fourth, Banther alleges that the Superior Court committed reversible error by allowing the admission of evidence of his indebtedness as a motive for the murder of Dennis Ravers, and by allowing the admission of other evidence of prior bad acts. Finally, Banther submits that the forelady of the jury had improper influences upon her performance as a juror and was not competent to serve as a juror.

This matter has been remanded to the Superior Court three times. The purpose of those remands was to develop a record to determine whether a new trial should be granted based upon newly discovered evidence. Some of the newly discovered evi-

**1.** Sitting by designation pursuant to Del. Const., art. IV, §§ 12 and 38 and Del.Code Ann. tit. 29, § 5610.

**2.** *State v. Banther,* 2000 WL 33109770, at *1 (Del.Super.).

**3.** *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

dence called into question the mental capacity of the jury forelady, Jane Smith,[4] to serve as a juror. Other newly discovered evidence reflected that the forelady was under investigation for embezzlement and also alleged that she was using cocaine during Banther's trial. The dispositive issue in this appeal, however, involves the lack of candor in the forelady's negative answer to the *voir dire* question during the jury selection process about whether she had been the victim of a violent crime.

The expanded record reflects that Banther's constitutional right to trial by an impartial jury was violated by Jane Smith's participation as a juror. Therefore, the judgments of conviction must be reversed. Bather's other claims of error will be addressed during the course of this opinion, since there will be a new trial.

### Procedural History

Banther was charged in a multiple count indictment as the result of the death of Dennis Ravers on or about February 12, 1997. Banther's attorney filed a motion to suppress, from the evidence at trial, statements made by Banther to the Delaware State Police and Maryland State Police. An evidentiary hearing regarding Banther's Motion to Suppress was held March 2, 1998 through March 13, 1998.

The Superior Court issued a written opinion dated September 24, 1998. The trial judge granted Banther's Motion to Suppress with respect to his February 25, 1997 statement to the Delaware State Police. The trial judge denied Banther's motion with respect to statements made on February 26, 1997, March 5, 1997, March 6, 1997, March 12, 1997, March 13, 1997, March 14, 1997 and July 30, 1997.

Jury selection was conducted on September 21, 1998 and September 22, 1998. Trial of the matter began on September 28, 1998. On October 27, 1998, the jury found Banther guilty of Murder in the First Degree, not guilty of Conspiracy to commit Murder in the First Degree, guilty of Possession of a Deadly Weapon During the Commission of a Felony, guilty of Forgery in the Second Degree and guilty of Felony Theft.

A penalty hearing was held on October 29, 1998, through November 4, 1998. The jury found by a vote of eleven to one that the murder was not premeditated and the result of substantial planning. The jury also determined by a nine to three vote that the murder was not committed for pecuniary gain. By an eleven to one vote, the jury found that the aggravating factors determined to exist did not outweigh the mitigating factors found to exist.

Banther was sentenced to serve life in prison without parole for the charge of Murder in the First Degree. He was sentenced to twenty years for the charge of Possession of a Deadly Weapon During the Commission of a Felony. He was sentenced to probation at Level III and Level II, respectively, for the charges of Forgery in the Second Degree and Theft. Banther filed a timely Notice of Appeal.

### Facts [5]

The case involves the murder of Dennis Ravers ("Ravers"). In the early morning hours of February 12, 1997, Ravers made a series of telephone calls to the Harrington Police Department dispatcher. Ravers explained that he was about to meet a man named "Charles" and that he was fearful for his life. Ravers further explained that

---

4. A pseudonym has been assigned by this Court pursuant to Supreme Court Rule 7(d).

5. These facts are primarily taken from the Superior Court's pre-trial decision on Banther's Motion to Suppress Evidence.

if he should turn up dead he wanted to go on record as reporting who would be responsible for his death.

Ravers then briefly met with the police dispatcher. The dispatcher took note of Ravers' glasses and clothing. Ravers later informed both the Harrington Police dispatcher and a Delaware State Police/911 dispatcher that he was going to meet Banther in front of the Farmington Fire House.

At 6:15 a.m. on February 12, a person traveling along Messobov Road in Harrington noticed two small fires burning. The person extinguished the fires and the property owner was notified. The Delaware State Fire Marshall and State Police were also contacted.

Blood and brain tissue were discovered at the site of the fire, as well as keys and eyeglasses that were later identified by the Harrington dispatcher as being similar to those worn by Ravers during their meeting. The Medical Examiner later determined that the blood and brain tissue found at the site was human. The Medical Examiner also concluded that the evidence found at the fire site was consistent with a homicidal assault. A casting was made from a tire print found at the scene.

The Delaware State Police learned that Banther and Ravers had been together two days before the fire was discovered, when they drove to the Dover Air Force Base. Ravers had earlier notified the military police that they were coming to the base and that Banther's car was not properly registered. When they arrived, the car was stopped by military police at the gate.

Because the proper ownership and registration of the vehicle was unclear, the two men were detained. Although Ravers remained on base and received a citation, Banther fled on foot. The vehicle he left behind was impounded on a military lot.

Later, the military police officers informed the Delaware State Police of a relationship among Ravers, Banther and John Schmitz ("Schmitz"). Schmitz was on active duty in the military, while both Ravers and Banther were retired from the military. In order to locate Banther and question him about Ravers, Schmitz was placed under surveillance.

The Delaware State Police eventually observed Banther and Schmitz traveling in separate vehicles west toward Maryland on February 25, 1997. The pair then split up and Banther proceeded south on U.S. Route 301. Having determined that Banther and Schmitz were driving with their licensees suspended, Detective John Evans of the Delaware State Police contacted the Maryland State Police and asked them to follow the vehicles and attempt to establish probable cause to stop them.[6]

Banther's vehicle was stopped by Deputy Michael Branham of the Queen Anne's County Sheriff's Department after he observed Banther driving erratically and his vehicle repeatedly crossing the center line without signaling. To safely stop Banther on an adequate shoulder of the road, Deputy Branham followed him across the Chesapeake Bay Bridge into Anne Arundel County before making the stop. Upon being stopped, Banther failed to produce a driver's license and he identified himself as "Jeffrey Ray Eldridge."

With Banther's consent, Deputy Branham searched the interior of the vehicle. He discovered a wallet containing Banther's military identification. This allowed

---

**6.** The Superior Court later ruled that with the information they had at the time, the Delaware State Police had a reasonable, articulable suspicion that Banther may have been involved in the murder of or at least an assault upon Ravers.

Deputy Branham to accurately identify Banther and to determine that Banther had given false information about his identity.

At 7:30 p.m., Banther was arrested at the scene for driving with a suspended/revoked license and for giving fictitious information to a police officer by Trooper Mark Bailey of the Maryland State Police. Trooper Bailey read Banther his *Miranda* rights. Banther stated that he understood his rights and voluntarily commented that he gave a false name because he believed the police officer who was following him was from the military. Trooper Bailey issued a criminal summons to Banther on the false statement charge, but detained him on the driving during suspension charge.

Banther was transported to the Maryland State Police barracks in Centreville, Maryland. Without being questioned, Banther volunteered other statements to Trooper Bailey, as he was being processed at the barracks, concerning items found in the car which included Ravers' military identification and vehicle registration card. Banther described a conversation he had with Ravers and explained that Ravers had left on a plane without the documents.

In the meantime, Schmitz had also been arrested by the Maryland State Police. At 10:15 that evening, he was interviewed by Detectives John Evans and Gary Cicchini of the Delaware State Police. Schmitz invoked his rights and questioning ceased.

The Delaware detectives then turned their attention to Banther, who gave a taped statement. At the outset of this interview, Banther told the detectives that while he wanted the property back which Ravers had taken from him, he did not want to talk to them about Ravers, that he would let his lawyer handle it, and that he wanted to talk to his lawyer before speaking to them. The detectives continued the interview ostensibly to address only the recovery of Banther's property in Ravers' possession.

The detectives also continued to question Banther, however, on where Ravers was, even after Banther had told them that he did not want to talk about Ravers. Banther told the detectives, among other things, that Ravers had boarded an airplane for California on the afternoon of February 12, 1997, that Ravers had taken many of Banther's personal belongings and that Banther wanted them back. The interview continued until it was interrupted by Trooper Bailey who indicated that the Commissioner was ready to see Banther for arraignment.

Following his arraignment that night, Banther was incarcerated for the traffic violation and housed in the Queen Anne's County Jail. The next morning, February 26, Banther contacted Detective Evans to initiate another interview. Detectives Evans and Cicchini returned to Maryland for that purpose. After being advised of his *Miranda* rights and waiving them, Banther agreed to answer questions. During this interview, Banther expressed his desire to go to California to find Ravers in order to retrieve his possessions.

Banther was eventually released from the Maryland jail following bail arrangements made by Schmitz. Over the following days, the investigation continued and search warrants were executed on the vehicles driven by Banther and Schmitz and on a room that they shared in a Washington, D.C. hotel. The police gathered evidence which included blood samples from Schmitz's truck, blood-stained clothing, newly purchased tires, portions of Ravers' military identification card, and receipts indicating that Banther and Schmitz had recently been in North Carolina.

Banther was then placed under surveillance on March 5th. At 3:49 p.m., Banther was seen approaching the Barclay, Maryland post office in Ravers' 1986 Toyota Camry. He then proceeded south on U.S. Route 301. While in Maryland, Banther telephoned Detective Evans and gave false information as to where he was and where he was going.

Detective Evans again asked Maryland authorities to stop Banther, who was again driving without a license. Banther was arrested at 4:28 p.m. for driving while suspended. He was transported to the nearby Centreville State Barracks. Following Banther's arrest, a search warrant was executed on the Toyota Camry. Evidence collected included more human blood and brain matter as well as documents belonging to both Banther and Schmitz.

Detectives Evans and Cicchini began to interview Banther at approximately 10 p.m. that evening. *Miranda* rights were again explained and waived by Banther. The interview lasted until approximately 1:00 a.m. on March 6th. Of this period, only a short portion of the taped record still exists because the detectives removed the tape at Banther's request and mistakenly recorded over part of it once the interview resumed on tape.

An incident occurred during the interview when Banther suddenly stood up, fists clenched at his sides, and refused to sit down when told to do so. The detectives physically put Banther back into his seat both for safety reasons and because of concern he might flee, as he did from Dover Air Force Base. Notwithstanding this incident involving minor physical contact, the Superior Court concluded that all of the Banther's statements during the interview were voluntarily made after his knowing, voluntary and intelligent waiver of his rights. At no point during the interview, on or off tape, did he invoke his right to remain silent or to have counsel.

Shortly after Banther was returned to his cell upon completion of the interview, he summoned Maryland State Police Sergeant Duane Boardman and indicated that he wished to tell him everything. Sergeant Boardman advised Banther of his *Miranda* rights and he waived those rights. Banther asked Sergeant Boardman to make a deal with him. Sergeant Boardman said he was not in a position to do that. Banther drew a map indicating where parts of Ravers' body could be found.

Banther also informed Sergeant Boardman that the two Delaware detectives manhandled him and that he received a minor cut. Sergeant Boardman had been nearby during the interview and had heard loud voices but no unusual noises. He had looked in during the earlier interview and found everyone to be fine. During his interview of Banther, Sergeant Boardman did observe a mark on Banther's arm which appeared self-inflicted.

Sergeant Boardman contacted Detectives Evans and Cicchini and informed them that Banther wanted to speak with them again. Banther gave a second statement to the detectives on March 6 which ended at 5:34 a.m. During this interview, Banther indicated that a man by the name of "Merlin" met with Banther and Ravers on the night of February 12 and struck Ravers over the head with a gun. Banther then indicated that "Merlin" disposed of Ravers' body and that Banther could take the detectives to North Carolina and show them where the body was buried. At one point, Banther inquired about the possible penalties facing "Merlin." Detective Cicchini explained briefly it could be a capital case where the penalty is lethal injection.

Later that morning, Banther was taken to the Maryland Commissioner for arraignment on the traffic charges then pending. Subsequently, Banther waived extradition. He was taken from Maryland to North Carolina where he was incarcerated on violation of probation charges.

On March 12, 1997, Banther met with Detective Evans in North Carolina for the purpose of showing them the location of Ravers' body. After Banther took the police to an incorrect location, the Detectives told him they would be going home. Banther then said, "Okay, I will take you to where Dennis' body is." Banther then showed them another location where, with the assistance of a cadaver dog, Ravers' body was found buried under a trash heap. Banther made no statements on that date in response to interrogation. Later that day, he told the North Carolina authorities that he wished to make further statements to Detective Evans.

On March 13 and 14, Banther gave further statements to Detective Evans in North Carolina after being given *Miranda* warnings once again. At this time, Banther told Detective Evans that Ravers met with him and Schmitz at the Farmington Fire House on the morning of February 12, 1997. He said the three then traveled to the Messobov Road scene at which time Ravers and Schmitz got into a heated fight. Banther said Schmitz hit Ravers over the head with an ax. He described how he and Schmitz then placed Ravers body into an empty 55–gallon drum, covered it with gasoline and wood, and attempted to burn it. He explained that when the two realized the fire would not stay ignited, they placed Ravers' remains in the trunk of Ravers' Toyota Camry and drove it to Washington, DC. He admitted that during the following week, the two buried Ravers' body in North Carolina.

On July 30, 1997, Banther was brought back to Delaware to face charges regarding the death of Ravers. Banther was flown into Dover Air Force Base. Upon landing, Banther suggested that he and Detective Evans go to the Messobov Road crime scene. After again being read his *Miranda* rights and waiving those rights, Banther was videotaped at this location as he described the events surrounding the crime. He was also interviewed by Detective Evans later that night on audiotape regarding the death of Ravers. Before speaking on audiotape, Banther was reminded of and waived his *Miranda* rights once again.

### Voir Dire Allegations

During jury selection in this case, the trial judge asked seven preliminary questions to the jury as a whole. The first five questions covered whether the length of the trial would be a difficulty; whether sequestration during jury deliberations would be a hardship; and whether the jurors knew the defendants, victims, attorneys, or witnesses in the case. None of these questions are alleged to be problematic. Question number six asked "do you have any bias or prejudice either for or against the State or the defendant that would make it difficult to render a fair decision in this case?" Question number seven asked "[i]s there any reason why you cannot give this case your undivided attention and render a fair and impartial verdict?"

Following these questions, the trial judge called the jurors and attorneys into his chambers to continue *voir dire* on an individual basis. Once in chambers, Ms. Smith stated her answer was "no" to all of the preliminary questions. She was asked again whether there was "any reason why [she couldn't] give this case [her] undivided attention" and to this she also answered "no." She was also asked: "Have you or a

close friend or relative been a victim or witness to a violent crime?" Smith answered "No, your Honor."

Banther alleges that Smith did not give truthful responses to the questions of whether she could give his case her undivided attention; whether she had any bias or prejudice either for or against the State; and whether she had been the victim of a violent crime. First, Banther alleges that Smith was under investigation for embezzlement during the course of his trial and pled guilty to charges of theft following his trial. Second, Banther alleges that Smith was using cocaine during his trial. Third, Banther alleges that the forelady had been sexually molested by her paternal grandfather as a child and reported being raped on two separate occasions prior to trial. Finally, Banther alleges that the Superior Court committed reversible error by not making any inquiry into the mental capacity of the jurors generally and the forelady in particular.

### *Forelady's Mental Health History*

Banther filed an amended motion for a new trial challenging the mental competence of the foreperson to serve as a juror. The motion alleged that the foreperson had been hospitalized for multiple personality disorders at an unspecified time prior to trial and had been subjected to an involuntary commitment for her own safety nine months after Banther's trial. The Superior Court denied Banther's motion for a new trial.

Title 10, section 4509(a) of the Delaware Code requires the trial court to "determine on the basis of information provided on the juror qualification form or interview with the prospective juror or other competent evidence whether the prospective juror is disqualified for jury service." Section

4509(b)(5) states that jurors who are "[I]ncapable, by reason of physical or mental disability, of rendering satisfactory jury service are not qualified to serve." Despite the statutory directive to determine each prospective juror's mental competence, the venire called for Banther's trial was not asked any questions about their mental health on either the standard juror qualification form or during the general and individual voir dire in this case.[7]

This matter was remanded originally to ascertain whether the forelady had a mental disability during Banther's trial. The expanded record upon remand reflects that the forelady received extensive treatment by mental health care professionals prior to her service as a juror:

- Smith underwent psychiatric treatment at St. John's Episcopal Hospital in Smithtown, New York, from May 23, 1987 through June 18, 1987. She was 15 years old. Smith was admitted after two suicide attempts. The records disclose that these suicide attempts and her open discussions of suicide were perpetuated by a history of molestation at the hands of her grandfather for 10 to 12 years. Her prognosis upon release was fair.

- Smith was again hospitalized in the same facility from December 18, 1987 through January 15, 1988 and had an intervening hospitalization at Hunnington Hospital in New York. Both hospitalizations arose out of an attempted suicide. The underlying cause of these attempted suicides was the 10 to 12 year history of molestation at the hands of her grandfather. Smith also reported being raped at knife point at the age of 12.

---

7. We expect that the Superior Court will comply with the statutory mandates of title 10, section 4509(a) and 4509(b)(5) of the Delaware Code in the future.

● Smith was again hospitalized at the same facility from April 21, 1988 through May 23, 1988. The discharge summary provides that Smith was admitted after becoming hysterical two days earlier in a health class when a film on sexual abuse was shown. Those records reiterate the history of sexual abuse suffered by Smith at the hands of her grandfather. Smith reported nightmares and dreams about her sexual liaisons with her grandfather. The prognosis upon discharge was fair.

The expanded record upon remand reflects that the forelady also received significant treatment by mental health care professionals subsequent to her service on the Banther jury. On August 27, 1999, less than nine months after Banther's trial, the forelady was the subject of an involuntary commitment proceeding. The Delaware Psychiatric Center records reflect that on August 24, 1999, she was incoherent, disruptive and out of control. The September 3, 1999 records state that she has been diagnosed with factitious disorder and other personality disorders. The medical records reflect her release from hospital care on January 4, 2000.

During the last remand, Banther's attorneys had the forelady's mental health records reviewed and evaluated by Dr. Rodgers Wilson, a Board Certified psychiatrist. Dr. Wilson summarized the forelady's psychiatric history, based on his examination of her medical mental health records, as follows:

Past psychiatric history is remarkable for previous suicide attempts and a history of alcohol and cannabis abuse which has been documented in the medical records. Diagnostically, she has carried the diagnoses of Adjustment Disorder with Depressive Mood Disorder, Major Depressive Disorder, NOS, Depressive Disorder NOS, Alcohol Abuse and Cocaine Abuse. The Juror has a history of childhood sexual abuse and a history of adult rape. She has had prior psychiatric hospitalizations at St. Johns Episcopal Hospital in Smithtown and St. Francis Hospital. There had been an adjudication proceeding started by the State of Delaware alleging that the Juror was mentally ill and dangerous. (The commitment was never fully adjudicated). Adolescent psychological testing has suggested average intelligence with a suggestion of a learning disorder indicated on psychological testing.

Dr. Wilson determined that "significant issues are raised as to whether the Juror had capacity at the time she rendered jury service." Dr. Wilson concluded, however, that "without a clinical interview of the Juror, relevant information cannot be attained to establish retrospective incapacity or capacity." Nevertheless, the trial judge's report to this Court states that he was "satisfied from the evidence presented and my own observations of the juror at the time of trial that she was fully capable of rendering satisfactory jury service."

### Forelady's Alleged Cocaine Use

At the post-trial hearing in this matter, Banther attempted to call Robert Puryear as a witness. He was a drug dealer who gave a statement that he sold cocaine to the forelady during Banther's trial. Mr. Puryear refused to testify to that effect, however, and invoked his rights under the Fifth Amendment. The State refused to offer him immunity.

Banther then attempted to introduce Mr. Puryear's written statement to an investigator in which he indicated that the forelady had been buying $600 to $700 worth of cocaine per week from him during the trial. The Superior Court excluded that statement from evidence as hearsay.

Banther argues that ruling was erroneous because the statement is admissible as a statement against penal interest, pursuant to Delaware Uniform Rule of Evidence 804(b)(3).

The expanded record reflects that several months after Banther's trial, Smith was hospitalized for mental health treatment and also tested positive for cocaine use. On remand, Smith did not admit using cocaine during Banther's trial, but did testify that she had gotten herself "clean and sober." The Superior Court ruled that, even if Smith was using cocaine during his trial, "Banther's claim involves an alleged internal, not an external, influence which is insufficient to impeach the jury verdict." [8]

### Forelady's Theft Conviction

With regard to the embezzlement claim, the record reflects that eleven days prior to the beginning of the trial in Banther's case, Smith was called into the office of the hotel where she was employed. She was confronted by her regional manager and Officer Rachko of the Dover Police Department. The regional manager alleged that none of the daily bank deposits—that were Smith's responsibility to make on behalf of the hotel—had been made.

The manager accused Smith of stealing approximately $30,000 to fund her gambling and cocaine addiction. Officer Rachko questioned Smith at length and told her that he would be investigating the charges. Officer Rachko also told her that he would be in contact with her regarding these allegations in the future.

During the course of Banther's trial, Officer Rachko did contact Smith. He left three messages on her answering machine asking her to call him with regard to the investigation. She eventually returned his call by leaving a message on his voice mail and telling him "I'm sorry, I haven't gotten back with you, Officer Rachko. I'm the Foreperson for a jury in a murder trial that's going on now. We are going on for a sentencing hearing."

Officer Rachko obtained an arrest warrant on November 20, 1998, about two weeks after the end of Banther's trial. He arrested Smith on December 7, 1998. On April 12, 1999, she pled guilty to the lesser charges of two counts of Misdemeanor theft in the amount of $8,000 before the same judge who had presided over Banther's trial.

The trial judge had no knowledge of these facts until Smith appeared before him, five months after Banther's trial was over, and pleaded guilty to the charges of theft. There are no indications that during the course of the trial Officer Rachko knew Smith was serving as a juror on a capital murder case other than the voice mail Smith left him with that information. There is also no indication that that he informed the prosecutors that Smith was under investigation or that they knew she had been until long after the trial was over.

Banther asserts that, given the circumstances of the ongoing criminal investigation for embezzlement, Smith could not honestly have thought that she would be without bias or prejudice either for or against the State or that she would be able to give this case her undivided attention. Banther submits that had Smith answered either of the two questions in the preliminary *voir dire* honestly, she would have been challenged for cause by counsel for either Banther or the State. Nevertheless, the Superior Court concluded that

---

8. In support of its ruling, the Superior Court cited *Tanner v. United States,* 483 U.S. 107, 117, 107 S.Ct. 2739, 97 L.Ed.2d 90 (1987); D.R.E. 606(b). *See also Fisher v. State,* 690 A.2d 917, 920–21, n. 4 (Del.1996) and *Massey v. State,* 541 A.2d 1254 (Del.1988).

there was no evidence that the ongoing investigation of Smith for embezzlement during the course of Banther's trial had any effect on Smith's participation as a juror.

The Juror Qualification Questionnaire for the United States District Court for the District of Delaware asks "are any charges pending against you for a violation of state or federal law punishable by imprisonment for more than one year?" In Maryland, a prospective juror is disqualified from serving if he or she "has a charge pending against him for a crime punishable by a fine of more than $500 or by imprisonment for more than six months or both." [9] The Superior Court should expand its standard questionnaire and *voir dire* to include this area of inquiry.

### Forelady Was Violent Crime Victim

The record is undisputed that Smith was molested as a child by her paternal grandfather and was institutionalized for mental health treatment as a teenager as a result of that molestation. When Smith was asked on remand why she did not disclose that history in response to the violent crime question during *voir dire*, Smith answered:

> I never considered it, A, a violent act; B, it was never an issue for me. During my voir dire and questioning, I answered honestly and to the best of my ability, and at that point in my life ... I did not consider myself at all involved in a violent crime or a victim of a violent crime.

The Superior Court report to this Court simply states that it "accepts her explanations." However, the complete lack of veracity in Smith's subjective assertion that her grandfather's sexual abuse was "never

an issue" is reflected in her objective medical records. Those records reveal four attempted suicides and six hospitalizations for psychiatric services as a result of her grandfather's sexual abuse.

The expanded record on remand reflects that the forelady also testified she was raped by another individual as an adult and became pregnant as a result of this encounter. During the *in camera* inquiry on remand about her mental capacity, in response to a question about an interruption in her employment history, Smith testified, "I had been assaulted and became pregnant, did not believe in abortion and I went through an open adoption with my son who is now eight." This disclosure by the former juror was not pursued with any further questioning by the Superior Court.

Therefore, this Court remanded the matter a second time so that the Superior Court could ascertain why Smith did not disclose the sexual assault that resulted in the birth of her son in response to the *voir dire* question: "Have you or a close friend or relative been a victim or a witness to a violent crime?" Upon remand, the Superior Court found that Smith had mistakenly conflated a sexual assault in January, 2000, with the event involving the birth and adoption of her son some eight years prior to trial. In its report to this Court, the Superior Court stated:

> During the original remand hearing Smith mistakenly combined into one answer two separate events. The first event she referred to was a sexual assault in January of 2000, approximately 14 months after her jury service. The other event was the birth and adoption of her son. In that instance the sexual relationship was with her consent. The

9. Md.Code (1957, 1996 Repl.Vol.), art. 27, § 342. *Hunt v. State*, 345 Md. 122, 691 A.2d 1255 (1997).

January of 2000 assault involved five men, one with a knife drawn, behind the Adams Four Shopping Center in Wilmington, Delaware. As a result of this assault by persons she could not identify by name, Smith became pregnant. This pregnancy ended in May of 2000 due to miscarriage.

Following Banther's trial, but before this Court's remand, Smith was hospitalized at Christiana Medical Center from May 18, 2000 through May 22, 2000. These medical records were before the Superior Court and attribute the following history to Smith.

She states that she had been struck from behind by 5 men unknown to her, but she remembered their faces. She does not remember anything after the attack incident until she awoke in the emergency room. She had a miscarriage one week prior to admission of a 4 month pregnancy. This was a result of the rape four months ago. The patient began bleeding on May 16, 2000. Other recent stressors includes the death of her younger brother, November, 1999, secondary to a motor vehicle accident with a drunk driver. The patient apparently missed the funeral of her older brother, because she was at the time being treated for spinal meningitis. Her mother committed suicide in March, 2000 with a gun shot wound. She also reported having divorced her husband of eight and a half years in September, 1999. She also reported she lost an older brother, also in a motor vehicle accident in November, 1996. She reported that she was raped two months prior to marriage, eight years ago, resulting in a child which was now up for adoption.

The Superior Court's finding that Smith was confused in her prior testimony is contradicted by the medical records in which Smith clearly delineated the two assaults, characterized them both as rapes, and described the first rape as resulting in the birth of her child.

In addition to the medical records that reflect a rape that resulted in the birth of Smith's son, a St. John's hospital psychiatric record dated January 4, 1988, describes another rape. According to those medical records, it occurred "at the age of 12 by a black man on an elevator at knife point." The trial judge's report to this Court simply states "I am not persuaded that actually happened."

### Juror Impartiality

The accused's right to be tried by a jury of his or her peers is fundamental to the criminal justice system in America.[10] An essential ingredient of that right is for the jury panel to be comprised of impartial or indifferent jurors.[11] Both the Sixth Amendment to the United States Constitution and Article I, § 7 of the Delaware Constitution guarantee a defendant in a criminal proceeding the right to a fair trial by an impartial jury.[12]

*Voir dire* is the historic method used to identify bias in prospective jurors and is critical to protecting a defendant's

10. *Hughes v. State*, 490 A.2d 1034, 1040 (Del. 1985); *see Duncan v. Louisiana*, 391 U.S. 145, 155–56, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968); *Irvin v. Dowd*, 366 U.S. 717, 721–22, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961).

11. *Hughes v. State*, 490 A.2d at 1040 (citing *Turner v. Louisiana*, 379 U.S. 466, 85 S.Ct. 546, 13 L.Ed.2d 424 (1965)); *see In re Oliver*, 333 U.S. 257, 68 S.Ct. 499, 92 L.Ed. 682 (1948).

12. *Flonnory v. State*, 778 A.2d 1044, 1051–52 (Del.2001); *see also Turner v. Louisiana*, 379 U.S. at 471–72, 85 S.Ct. 546; *In re Oliver*, 333 U.S. at 267–68, 68 S.Ct. 499.

right to a fair trial by an impartial jury.[13] "The purpose of *voir dire* examination is to provide the court [and the parties] with sufficient information to decide whether prospective jurors can render an impartial verdict based on the evidence developed at trial in accordance with the applicable law." [14] One of the primary safeguards for impaneling a fair and impartial jury is a defendant's right to challenge prospective jurors, either peremptorily or for cause.[15] That right to challenge is seriously impaired by a juror's denial or nondisclosure of material information in response to a *voir dire* question.[16]

In *Jackson v. State*,[17] this Court stated that juror impartiality must be maintained, not only in the interest of fairness to the accused in the given case, but also to assure the integrity of the judicial process itself.[18] In *Jackson*, we quoted from a case that is now more than ninety years old:

> Aside from protecting the rights of parties, in the fair and impartial administration of justice, respect for the courts calls for their condemnation of any improper conduct, however slight, on the part of a juror, of a party, or of any other person, calculated to influence the jury in returning a verdict. So delicate are the balances in weighing justice that what might seem trivial under some circumstances would turn the scales to its perversion. *Not only the evil, in such cases, but the appearances of evil, if possible, should be avoided.*[19]

Jury bias, either actual or apparent, undermines society's confidence in its judicial system.[20]

### *Violent Crime Victim Constitutes Challenge For Cause*

In this case, it is unnecessary to address the issue of Smith's mental capacity during Banther's trial but we expect that the Superior Court will comply with the statutory mandates of title 10, section 4509(a) and 4509(b)(5) of the Delaware Code in the future. We also need not decide whether her alleged use of cocaine and the pendency of the theft charges caused actual prejudice to Banther and, thus, constituted reversible error.[21] The cumulative appearance of these troubling circumstances in the background of one juror do, however, raise serious concerns about the adequacy of the current Superior Court's Juror Questionnaire and standard *voir dire* questions.

13. *Diaz v. State*, 743 A.2d 1166, 1172 (Del. 1999) (citing *United States v. Burr*, 25 F. Cas. 49, 51 (C.C.D.Va.1807)); *see Morgan v. Illinois*, 504 U.S. 719, 729, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992); *Rosales–Lopez v. United States*, 451 U.S. 182, 188, 101 S.Ct. 1629, 68 L.Ed.2d 22 (1981).

14. *Hughes v. State*, 490 A.2d at 1041 (citing *Parson v. State*, 275 A.2d 777, 780 (Del.1971)).

15. *Jackson v. State*, 374 A.2d 1, 2 (Del.1977).

16. *Id.* (citing *Sanders v. Scarvey*, 284 Ala. 215, 224 So.2d 247, 251 (1969); *Skiles v. Ryder Truck Lines, Inc.*, 267 So.2d 379, 381–82 (Fla. App.1972); *State v. Allred*, 275 N.C. 554, 169 S.E.2d 833, 837–39 (1969); C.T. Foster, Annotation, *Juror's Voir Dire Denial or Nondis-*

*closure of Acquaintance or Relationship with Attorney in Case, or with Partner or Associate of such Attorney, as Ground for New Trial or Mistrial*, 64 A.L.R.3d 126 (1976)).

17. *Jackson v. State*, 374 A.2d at 1.

18. *Id.* at 2.

19. *Jackson v. State*, 374 A.2d at 2–3 (emphasis added) (quoting *George F. Craig & Co. v. Pierson Lumber Co.*, 169 Ala. 548, 53 So. 803, 805 (1910)).

20. *Id.*

21. *Massey v. State*, 541 A.2d 1254 (Del.1988) (defendant has burden of proving actual prejudice).

 The United States Supreme Court addressed the "clear error" standard of review in *Anderson v. City of Bessemer City.*[22] Under *Anderson*, appellate review for clear error requires not just deference to the fact finder's conclusions, but a very specific level of deference:

> If the [trial judge's] account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.[23]

An appellate court may reject the fact finder's choice between conflicting evidence only where there is something wrong with the choice.[24] When findings are based on determinations regarding the credibility of witnesses, the level of deference is even higher.[25]

 There are generally three ways in which a factual finding based on credibility could be clearly erroneous.[26] First, the accepted testimony could be incoherent or facially implausible. Second, the testimony could be contradicted by extrinsic evidence. Third, the finding itself could be internally inconsistent. In this case, the Superior Court's conclusions were clearly erroneous because the forelady's testimony was implausible, contradicted by extrinsic evidence, and internally inconsistent.

The record is clear that after Banther's trial, Smith pled guilty to theft, tested positive for cocaine, and was hospitalized for mental health reasons. These uncontested facts were extant when Smith testified at the remand hearings. Individually and collectively these post-trial events vitiate the credibility of Smith's subjective assertions on remand that her grandfather's sexual abuse was never an issue for her and that she was confused when she originally testified that a sexual assault resulted in the birth of her son.

 Statements for medical diagnosis and treatment are admissible as an exception to the hearsay rule because such statements are deemed to be inherently trustworthy.[27] It is undisputed that the medical records in this case reflect that the forelady on Banther's jury was sexually molested throughout her childhood by her grandfather, raped at the age of twelve and that a sexual assault eight years prior to Banther's trial resulted in the birth of her son. Nevertheless, she responded in the negative when she was asked on *voir dire* if she had been the victim of a violent crime.

The Superior Court concluded that the long history of sexual abuse as a child by Smith's grandfather was true but would not have been a basis to challenge Smith for cause; was not persuaded the rape at age twelve actually happened; and that Smith was confused about the sexual assault that resulted in the birth of her son. None of those conclusions are supported by the objective medical records. Smith's prior medical records are consistent objective evidence that she had been the victim of violent crimes prior to Banther's trial. The expanded record supports a conclusion that the juror's incorrect answer to

22. *Anderson v. City of Bessemer City*, 470 U.S. 564, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985).

23. *Id.* at 573–74, 105 S.Ct. 1504.

24. *See id.* at 574–75, 105 S.Ct. 1504.

25. *Id.* at 575, 105 S.Ct. 1504.

26. *Id.*

27. D.R.E. 803(4).

the *voir dire* question was purposefully untrue and not simply inadvertently inaccurate.[28]

In *Jackson,* we observed that the impartial administration of justice is severely compromised when the juror's nondisclosure of *material* information during *voir dire* is deliberate.[29] The right of a defendant to a fair trial by a panel of impartial jurors is basic to our system of justice.[30] The United States Supreme Court has held that "for the failure of a juror to answer accurately a question on *voir dire* to constitute reversible error, a party must first demonstrate that a juror failed to honestly answer a material question on *voir dire,* and then further show that a correct response would have provided a valid basis for a challenge for cause."[31]

■ During jury selection in a capital murder case, the answer to a question about being the victim of a violent crime is material. Banther has demonstrated that the forelady failed to answer honestly a material question on *voir dire*—whether she had been the victim of a violent crime.[32] Banther has also demonstrated that "a correct response would have provided a valid basis for a challenge for cause."[33] Accordingly, we hold that Banther's right to a fair trial by an impartial jury, as guaranteed by both the Sixth Amendment to the United States Constitution and article I, § 7 of the Delaware Constitution, was violated.[34]

The United States Supreme Court has held that the presence of a biased juror introduces a structural defect that is not subject to a harmless error analysis.[35] Therefore, the judgments of the Superior Court must be reversed. Since this matter will be remanded for a new trial, we will address the other issues raised by Banther on appeal.

### Banther's Statements Properly Admitted

■ Banther filed a pre-trial motion to suppress all his statements made to the Delaware State Police and Maryland State Police. Banther gave tape recorded statements to the police on February 25, 1997, February 26, 1997, March 5, 1997, two statements on March 6, 1997, March 13, 1997, March 14, 1997, July 30, 1997 and a videotaped statement at the homicide scene on July 30, 1997. In addition, on

28. *Banther v. State,* 783 A.2d 1287, 1291–92 (Del.2001).

29. *Jackson v. State,* 374 A.2d at 2.

30. *Hughes v. State,* 490 A.2d at 1040; *see Duncan v. Louisiana,* 391 U.S. at 155–56, 88 S.Ct. 1444; *Irvin v. Dowd,* 366 U.S. at 721–22, 81 S.Ct. 1639.

31. *McDonough Power Equip., Inc. v. Greenwood,* 464 U.S. 548, 555–56, 104 S.Ct. 845, 78 L.Ed.2d 663 (1984); *Dyer v. Calderon,* 151 F.3d 970, 973 (9th Cir.1998); *United States v. St. Clair,* 855 F.2d 518, 521–23 (8th Cir.1988); *cf. State v. Williams,* 1995 WL 129216 (Tenn. Crim.App.1995); *Lewis v. State,* 725 So.2d 183 (Miss.1998); *State v. Dennis,* 79 Ohio St.3d 421, 683 N.E.2d 1096 (1997); *Sears v. State,* 270 Ga. 834, 514 S.E.2d 426 (1999); *Fitzgerald v. Greene,* 150 F.3d 357, 362–63

(4th Cir.1998) (juror's interpretation of *voir dire* question did not indicate dishonesty but rather factual accuracy); *United States v. Edmond,* 43 F.3d 472, 473–74 (9th Cir.1994) (simple forgetfulness of juror did not indicate lack of impartiality); *Amirault v. Fair,* 968 F.2d 1404, 1405–06 (1st Cir.1992) (juror's genuine blocking of incident from memory did not indicate dishonest response).

32. *McDonough Power Equip., Inc. v. Greenwood,* 464 U.S. at 555–56, 104 S.Ct. 845.

33. *Id.*

34. *Michigan v. Long,* 463 U.S. 1032, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983).

35. *Arizona v. Fulminante,* 499 U.S. 279, 307–10, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991).

March 12, 1997, Banther took the police to the body of Dennis Ravers which was buried in a shallow grave in North Carolina. On that day, Banther gave an oral, unsolicited statement to Timothy Thayer of the North Carolina Bureau of Investigation. Banther told Thayer that he and Schmitz had met Ravers in Harrington, Delaware and that when an argument ensued, Schmitz hit Ravers in the head with an axe.

The Superior Court held an evidentiary hearing on Banther's pretrial evidence suppression motion. Over the course of six days, Delaware State Police Detectives John Evans and Gary Cicchini, several Maryland State Police officers, and Banther testified. Banther argued that his statements should be suppressed because they were the product of illegal seizures of his person and his vehicle; he had not been promptly presented to a magistrate; the statements were taken in violation of *Miranda v. Arizona;*[36] and the statements were involuntary.

On appeal, Banther argues that the Superior Court abused its discretion in not suppressing all of his statements. Specifically, he now argues that his numerous statements were made after the police "failed to honor" his "repeated clear, unambiguous and unequivocal attempts to invoke his right to remain silent and right to counsel, promised Banther that they would recover for him the property that had been stolen from him by Ravers and that he would receive favorable treatment in terms of a 'deal,' threatened him with the imposition of the death penalty and ultimately, physically assaulted Banther in a persistent and unrelenting effort to induce Banther to provide them with statements regarding the death of Dennis Ravers."

The Superior Court suppressed the first statement made by Banther on February 25, 1997, but denied Banther's motion as to all of the remaining statements.[37] The Superior Court ruled that although the February 25, 1997 statement by Banther was voluntary, it was taken after Banther had invoked his right to silence and must be suppressed during the State's case-in-chief. Banther continues to challenge the trial judge's determination that his February 25 was "voluntary and the product of Banther's free will." Since Banther elected not to testify at trial or to present any defense witnesses, however, the State made no attempt to introduce the February 25 statement for purposes of impeachment at trial.[38] Thus, that statement is not an issue on appeal.

Banther also argues that his attempts to contact an attorney should have been redacted from the statements that were admitted into evidence, as well as his numerous attempts to "exercise his right to cut off questioning" until a "deal" had been formalized. The trial court ordered redaction of Banther's February 26 statement regarding advice he had received from an attorney. As to the remainder of the redaction requests the trial judge ruled that "there is no unequivocal invocation of rights in this statement." The trial judge found that Banther's references to an attorney were in the context of allegedly attempting to recover his property from Ravers. The trial judge did not abuse his discretion in finding that "seeing a lawyer about a civil matter is not prejudicial."

---

**36.** *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

**37.** *State v. Banther,* 1998 WL 961765 (Del.Super.).

**38.** *See DeShields v. State,* 534 A.2d 630, 650 (Del.1987).

■ After considering the suppression hearing testimony of the Delaware and Maryland police officers and listening to all of the recorded and unrecorded statements, the trial judge found that Banther made a voluntary, knowing and intelligent waiver of his *Miranda* rights each time he spoke to the police after February 25, 1997. The trial judge ruled as follows:

> After the initial questioning ceased, Banther initiated the subsequent interviews with Sergeant Boardman and the Delaware detectives. Banther was given *Miranda* warnings before each new interview. After each set of warnings, it is clear that Banther understood his rights and that he knowingly and voluntarily waived them.

■ A trial judge's suppression ruling is reviewed *de novo* on appeal because it involves mixed questions of fact and law. The Superior Court's factual findings as to all of the claims asserted on appeal by Banther are supported by the testimony presented during the six days of the pretrial suppression hearing and the taped statements themselves. These factual findings are not clearly erroneous.[39] The trial judge also applied the proper legal analysis to these factual findings. Accordingly, all of the Superior Court's rulings on Banther's pre-trial Motion to Suppress Evidence are affirmed on the basis of the reasons set forth in its opinion.[40]

■ On the fifth and sixth days of trial, Banther raised an objection under D.R.E. 410, on the basis that portions of his statements were inadmissible as part of plea negotiations to resolve the North Carolina charges and to avoid being charged with murder in Delaware. Banther's argument on appeal is that the trial judge erred, as a matter of law, in rejecting his D.R.E. 410 argument. According to Banther, he "had an actual, subjective expectation to negotiate the disposition of potential criminal charges when he made his March 5 and 6, 1997 statements to Detectives Evans and Cicchini and Sergeant Boardman." In denying Banther's motion, the trial judge reasoned:

> In this case I find that no plea was offered nor was the defendant reasonably expecting to negotiate a plea with the police. Further, it was clear from the totality of the circumstances that the Delaware State Police did not make a deal or attempt to negotiate a plea agreement, nor was there improper overreaching by them. Rather, they made it clear to the defendant that they could not tell him what was going to happen to him. Rule 410 does not apply to the facts before the Court under this analysis. Even if it arguably did, the policies underlying the rule would not be furthered by protecting voluntary, deliberate and untruthful statements.

The trial judge's decision rejecting Banther's D.R.E. 410 argument was legally correct.

### Videotape Properly Redacted

■ Banther's next argument on appeal is that the trial judge improperly admitted a redacted version of his July 30, 1997 videotaped statement made at the crime scene. Banther argues that under D.R.E. 106 and D.R.E. 403, the entire videotaped statement, including his statement that the codefendant, Schmitz, had

**39.** See *DeJesus v. State*, 655 A.2d 1180, 1191 (Del.1995); *Marine v. State*, 607 A.2d 1185, 1194 (Del.1992); *Albury v. State*, 551 A.2d 53, 60 (Del.1988); *Martin v. State*, 433 A.2d 1025, 1033 (Del.1981), *cert. denied*, 454 U.S. 1151, 102 S.Ct. 1018, 71 L.Ed.2d 306 (1982); *State v. Rooks*, 401 A.2d 943, 949 (Del.1979).

**40.** *State v. Banther*, 1998 WL 961765 (Del.Super.).

allegedly confessed to his attorney, should have been admitted to show Banther's state of mind with regard to why he had lied to the police in previous statements. In the alternative, Banther argues that the entire videotape should have been excluded because it was "incurably prejudicial" for the jury to see Banther wearing leg shackles.

The trial judge rejected Banther's argument that "fairness" required the entire videotaped statement to be admitted under D.R.E. 106. The trial judge ruled that "Rule 403 supercedes 106, if the circumstances warrant." We agree. D.R.E. 106 does not make otherwise inadmissible evidence admissible.[41] The trial judge properly exercised his discretion in ruling that "these are self-serving statements which will not be subject to cross-examination. The probative value is substantially outweighed by the danger of unfair prejudice under Rule 403 and *Williamson* analysis."[42] In *Williamson v. State*,[43] this Court held that a redacted statement's probative value was outweighed by potential prejudice to the State under Delaware Rule of Evidence 403, where the defendant had refused to testify thereby foreclosing any opportunity for cross-examination. In the event that Banther testifies at his next trial, the Superior Court can reconsider its ruling if a proper motion is made by Banther.

Banther argues that he should have been permitted to admit his claim that Schmitz had confessed to Schmitz's attorney in order to explain to the jury why he had lied in prior statements to the police. The trial judge did not abuse his discretion in granting the State's redaction request

and denying Banther's D.R.E. 106 claim because Banther had already explained the changes in his story in an earlier statement to the police, rendering any additional explanation cumulative. During his March 14, 1998 statement, after having incriminated Schmitz, Banther stated, "And the reason I've been lying on the previous tapes, I was trying to protect John and my girlfriend, and I guess myself too."

▆▆▆ After the trial judge granted the State's motion to redact Banther's statement that Schmitz had confessed, the State agreed to redact the immediately preceding question that had elicited Banther's response. At trial, and on appeal, Banther contends that the redaction should have gone further by eliminating the detective's remark that there were inconsistencies in Banther's statements. The trial judge, as the gatekeeper to admission or exclusion of evidence, is in the best position to weigh the probative value of the July 30 videotape against the risk of unfair prejudice under D.R.E. 403. The record reflects that ordering the redaction of Banther's answer and the immediately preceding question was not an abuse of discretion.[44]

▆▆▆ After the trial judge's rejection of Banther's D.R.E. 106 argument to admit his entire videotaped statement, Banther moved to exclude any use of his videotaped statement at the crime scene as highly prejudicial in its content. The basis of Banther's objection was that the videotape depicted Banther in leg shackles, and "accompanied by armed police detectives." According to Banther, the admission of the

---

**41.** *Cf. United States v. Collicott*, 92 F.3d 973, 982 (9th Cir.1996) (construing F.R.E. 106).

**42.** *See Williamson v. State*, 707 A.2d 350, 351 (Del.1998).

**43.** *Id.* at 361.

**44.** *See Floudiotis v. State*, 726 A.2d 1196, 1201 (Del.1999).

July 30, 1997 videotaped statement made at the crime scene was so prejudicial that even with the curative instruction given by the trial judge, the videotape compromised his presumption of innocence. The trial judge ruled as follows:

> The evidence in this case already indicates that the defendant was in custody and was being transported from North Carolina to Delaware through an extradition process. The jury is aware that he was in custody at the time. With a curative instruction which I will give, I am convinced that the probative value of the tape is not substantially outweighed by the danger of unfair prejudice.

Delaware has a long honored practice, recognized in the common law as long ago as 1678, of exhibiting a defendant to the jury only while out of handcuffs.[45] Generally, however, "there is no reversible error if members of the jury view a defendant in handcuffs *when he is in custody outside of the courtroom itself* ...."[46] Moreover, this Court has held that, in the absence of actual prejudice, briefly exposing a handcuffed defendant in transit to the jury does not constitute reversible error.[47] Here, the jury knew that the defendant had been arrested in Maryland and transported to Delaware pursuant to a process of extradition. The Superior Court recognized that "[t]he jury is aware that he was in custody at the time [the video was made], and the video was clearly recorded outside the purview of the courtroom, even though viewed in the courtroom." Thus, the trial judge ruled that

"[w]ith a curative instruction which I will give, I am convinced that the probative value of the tape is not substantially outweighed by the danger of unfair prejudice." The record reflects that the trial judge's ruling was a proper exercise of discretion.

### *Right to Compulsory Process*

Banther also challenges the sufficiency of Schmitz's appearance via closed-circuit television, wherein he invoked his Fifth Amendment privilege against self-incrimination. Banther makes two arguments. One is based on the process by which Schmitz appeared. The second is based upon the substantive nature of Schmitz's appearance.

At trial, Banther subpoenaed Schmitz as a witness. Schmitz was incarcerated at that time awaiting trial on the same capital murder charge for which Banther was on trial. Schmitz's attorney appeared and presented Schmitz's Motion to Quash the Subpoena on the grounds that other than providing his name, Schmitz would simply invoke his Fifth Amendment rights in response to any questioning. The next day, Schmitz appeared via closed-circuit television and confirmed that, if he were compelled to appear in court, he would invoke his Fifth Amendment right against self-incrimination.

The Fifth Amendment privilege against self-incrimination "is a personal one to be claimed by the party under oath, and not by his attorney."[48] After a brief

---

**45.** *Brookins v. State*, 354 A.2d 422, 425 (Del. 1976) (citing *Commonwealth v. Cruz*, 226 Pa.Super. 241, 311 A.2d 691 (1973) and Hale's Pleas of the Crown, 219 (1678)) ("The prisoner, tho under indictment of the highest crime, must be brought to the bar without irons, and all matter of shackles or bonds ... unless there by danger of escape ....").

**46.** *Id.* (citing *State v. Sawyer*, 60 Wash.2d 83, 371 P.2d 932 (1962); *United States v. Rickus*, 351 F.Supp. 1386 (E.D.Pa.1972))(emphasis added).

**47.** *Duonnolo v. State*, 397 A.2d 126, 130–31 (Del.1978); *Brookins v. State*, 354 A.2d at 425.

**48.** *Steigler v. Ins. Co. of North America*, 306 A.2d 742 (Del.1973)

recess, the trial judge ruled that Schmitz's unsworn appearance via closed-circuit television was sufficient for purposes of invoking his Fifth Amendment privilege against self-incrimination. The trial judge determined that because Schmitz was personally confirming what his counsel already stated on the record—that if questioned, Schmitz would invoke his Fifth Amendment privilege—it was unnecessary to have Schmitz appear in person to recount the same testimony under oath.

"To the extent [a witness'] proposed testimony may implicate the fundamental fairness of the proceeding" we have held that due process may require the issuance of a subpoena.[49] The trial judge correctly noted that Banther had no right to have Schmitz assert his Fifth Amendment privilege before the jury.[50] The record reflects that, under the circumstances presented, Banther's right to compulsory process was not violated when the trial judge refused to compel testimony of a co-defendant who had asserted his Fifth amendment rights.[51]

In addition to his testimony, Banther apparently subpoenaed Schmitz in order to present his physical appearance to the jury. Banther wanted Schmitz to appear before the jury so that the jurors could observe his height and weight, which were much greater than Banther's physical characteristics. The purpose of this "show-up" was to suggest to the jury that Schmitz was the person who actually committed the murder.

The trial judge, relying upon Delaware Rule of Evidence 403, excluded the "show-up." In particular, the trial judge ruled that the show-up would have been cumulative because evidence had already been admitted, "both photographic and otherwise, showing the size, weight, and age of co-defendant Schmitz." Accordingly, the trial judge did not abuse his discretion by excluding the "show-up" of Schmitz.[52]

### Indebtedness and Bad Acts

■ Banther's final argument challenges the certain other evidentiary rulings by trial judge under either D.R.E. 403 or 404(b). At trial, the State presented evidence that Banther owed Samo Lesjak $700 and Michael Hall and his mother an additional $950 to $1,150. The Superior Court permitted the evidence over defense objection to prove motive for the murder.[53] The trial judge did the appropriate analysis under *Getz*.[54] There was no abuse of discretion in allowing the evidence of Banther's indebtedness to prove motive for the murder.

■ The trial judge also pointed out that Banther was charged with theft. The evidence at trial showed that Banther forged an endorsement on a $1,500 check drawn on Ravers' checking account two days after the homicide. This evidence led to Banther's convictions for Forgery in the Second Degree and Felony Theft. Therefore, the debt evidence was also indepen-

**49.** *Torres v. Allen Family Foods,* 672 A.2d 26, 32 (Del.1995).

**50.** In particular, the trial judge relied upon the American Bar Association Standards for Criminal Justice, Prosecution Function and Defense Function, (3d Ed.) standards 3–5.7(c) and 4–7.6(c).

**51.** *U.S. v. Bowling,* 239 F.3d 973, 976–77 (8th Cir.2001).

**52.** *Kiser v. State,* 769 A.2d 736, 743 n. 4 (Del.2001).

**53.** *See United States v. Shriver,* 842 F.2d 968, 974 (7th Cir.1988).

**54.** *Getz v. State,* 538 A.2d 726, 734 (Del.1988).

dently relevant in establishing a motive for the forgery and theft charges.[55]

In addition to objecting to evidence that Banther owed two debts, the defense objected at trial to evidence that Banther fled from military police after a motor vehicle stop on February 10, 1997; that Banther gave a false name to the Maryland State Police and drove with a suspended license on February 25, 1997; that Banther had some connection with a dealer's price list for weapons and that there was a second motor vehicle stop of Banther in Maryland on March 5, 1997 for driving while suspended and for being wanted for a North Carolina parole violation.

The Superior Court did the appropriate *Getz* analysis for three of these items. No *Getz* analysis was required for the price list since this involved neither a bad act nor other crime. With regard to the price list, the trial judge performed the proper balancing analysis in response to the defense objection under D.R.E. 403. Banther has shown no abuse of discretion as to any of the trial judge's evidentiary rulings on the four matters challenged under either D.R.E. 403 or 404(b).

### Conclusion

The judgments of the Superior Court are reversed. This matter is remanded for a new trial in accordance with this opinion. Pursuant to Supreme Court Rule 18, the time within which a motion for reargument may be filed in this matter is shortened to three days from the date of this Opinion.

---

**55.** *See Stevenson v. State,* 709 A.2d 619, 631 (Del.1998).